**UNITED STATES v. COLORADO WHOLE-
SALE WINE & LIQUOR DEALERS
ASS'N, Inc., et al.**

No. 9514.

District Court, D. Colorado.

Oct. 10, 1942.

James McI. Henderson and George B. Haddock, Sp. Assts. to Atty. Gen., and Sheridan Morgan, Joseph J. Cella, Jr., Donald W. Marshall, and James R. Browning, Sp. Attys., all of Denver, Colo., for plaintiff.

Morris Rifkin, of Denver, Colo., for Colorado Package Liquor Ass'n Inc., and others.

Percy S. Morris and Charles Rosenbaum, both of Denver, Colo., for Hiram Walker, Inc., and others.

Grant, Shafroth & Toll, of Denver, Colo., for Seagram-Distillers Corporation and others.

E. R. Morrison, of Kansas City, Mo., and Charles Rosenbaum, of Denver, Colo., for Waterfill & Frazier Distillery Co. and another.

Robert S. Marx, of Cincinnati, Ohio, and Rothgerber & Appel, of Denver, Colo., for Schenley Distillers Corporation and another.

C. C. Dawson, Jr., Robert G. Bosworth, and Pershing, Bosworth, Dick & Dawson, all of Denver, Colo., for Ben-Burk, Inc., and others.

Robert E. More, M. J. Keegan, and Dines, Dines & Holme, all of Denver, Colo., for Brown Forman Distillers Corporation and another.

Max D. Melville and Ellis, Melville & Winner, all of Denver, Colo., for Glenmore Distilleries Co. and others.

William V. Hodges and Hodges, Vidal & Goree, all of Denver, Colo., for National Distillers Products Corporation and others.

A. G. Gertz and Hellerstein & Gertz, all of Denver, Colo., for D. J. Bielzoff Products Co.

M. O. Edison, of Denver, Colo., for American Distilling Co. and another.

Richard M. Davis and Newton, Davis, Drinkwater & Henry, all of Denver, Colo., for Somerset Importers, Ltd.

Byron G. Rogers, of Denver, Colo., for East-Side Winery and another.

Kenneth W. Robinson, Van Cise, Robinson & Charlton, and Quiat & Cummings, all of Denver, Colo., for Davis Bros., Inc., and others.

Sidney S. Jacobs, of Denver, Colo., for Colorado Beverage Co.

Graham Susman and Quiat & Cummings, all of Denver, Colo., for Colorado Alcohol Co. and others.

Julius Seeman, of Denver, Colo., for George M. Wheat and others.

Edward Miller, of Denver, Colo., for Isadore E. Eber and another.

Frank L. Fetzer, of Denver, Colo., for Earl B. Lewkowitz.

SYMES, District Judge.

The sufficiency of this indictment returned March 12, 1942, is directly raised by numerous motions to quash and demurrers filed by the several defendants. Exhaustive arguments have been had and many briefs filed. Count 1 of the indictment charges a combination and conspiracy to raise, fix and maintain the wholesale price of spirituous liquor and wines. The second count charges a similar combination and conspiracy to raise, fix and maintain the retail prices of alcoholic beverages. Each count charges a violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1.

In the arguments at the bar, and in the briefs of defendants, the issues made are: that intoxicating liquor should be accorded a different status from other commodities in the application of the Sherman Act. The argument made is that by virtue of the 21st Amendment to the Constitution, trans-

actions involving interstate sales of alcoholic beverages are removed from the operation of the Commerce Clause of the Federal Constitution, art. 1, § 8, cl. 3, and subject to the exclusive regulation of the several states after its arrival therein; and secondly, the charges contained in the indictment in question relate solely to wholesale and retail transactions within the State of Colorado—hence are not transactions in interstate commerce.

The indictment briefly (par. 18 to 21), describes the nature of the trade and commerce involved in the indictment, alleging that alcoholic beverages are marketed in Colorado by a continuous flow of shipments from producers located in other states to and through wholesalers and retailers in Colorado, to the consuming public; that 98%, or more, of all spirituous liquor consumed in Colorado is produced outside and shipped into the state, and thus distributed.

Paragraph 22, count 1, charges that the defendants and the other persons unknown, engaged in a combination and conspiracy, "to raise, fix and maintain the wholesale prices of spirituous liquor and wines shipped into the State of Colorado from producers located outside of Colorado, by raising, fixing, and stabilizing wholesale mark-ups and margins of profit on such liquor and wines."

In count 2 of the indictment the charge is exactly the same, except it refers to fixing the retail prices.

It is further charged that the effect of the conspiracy charged is to raise, fix and stabilize, and the maintenance of a wholesale price in Colorado at levels acceptable to and approved by the defendants, thus eliminating price competition among the defendant wholesalers, and between the defendant wholesalers and other members of the defendant wholesale association in the sale and distribution of spirituous liquor and wines shipped into Colorado in interstate commerce, and restraining and suppressing interstate trade and commerce in spirituous liquors and wines not covered by producer-wholesaler fair trade contracts.

■ The first point made by the defendants may be briefly disposed of. We cannot agree that by the 21st Amendment to the Constitution liquor was removed from interstate commerce, or that jurisdiction over it was thereby vested exclusively in the several states, nor that the said Amendment gave the individual states control over intoxicating liquor within their respective borders, with supreme jurisdiction to regulate or limit the sale thereof, without violating the Commerce Clause of the Federal Constitution and the Sherman Act.

■ We take judicial notice that the objective of the 21st Amendment was the repeal of the 18th Amendment. The proviso therein contained prohibiting the transportation or importation into a state for delivery or use in violation of the laws thereof of liquor was a saving clause to avoid a conflict with those states which at the time had their own state prohibition laws, or might thereafter adopt prohibition as a matter of state policy. The Amendment was never intended to deprive the Federal Government of any of its vast powers over interstate commerce between, or among the states, and certainly was not designed to limit in the slightest degree the jurisdiction of the Federal Government or the powers conferred upon it by the Commerce Clause of the Federal Constitution.

In Jameson & Co. v. Morgenthau, 307 U.S. 171, 59 S.Ct. 804, 83 L.Ed. 1189, the Supreme Court held that there was no substance in the contention that the 21st Amendment gave the states any exclusive control over commerce in intoxicating liquors, unlimited by the Commerce Clause of the Federal Constitution. The Amendment simply gives the states the right to adopt or reject prohibition as a matter of state policy as they might see fit.

■ The power of Congress over interstate commerce is complete and can neither be enlarged nor diminished by the exercise or non-exercise of state power, and extends to those intrastate activities which so affect interstate commerce, or the exercise of the power of Congress over it, as to make their regulation an appropriate means to the attainment of a legitimate end.

■ In the case at bar the agreement denounced in the indictment may, for the sake of argument, be denominated as an intrastate activity or agreement. It nevertheless affected interstate commerce, because it regulated and prescribed the price at which liquor shipped by certain defendants—the producers—to other defendants—the wholesalers and retailers in Colorado—would be sold for consumption and resale there. Thus it is an intrastate activity affecting interstate commerce, and subject to the Sherman Act. United States v.

Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430.

■ In reference to the Wilson Act, 27 U.S.C.A. § 121, and the other similar acts discussed at length in some of the briefs in support of the motions, it is only necessary to say that they merely provide that liquors transported into any state and remaining there for use, shall upon arrival in such state be subject to the operation and effect of the laws of such state enacted in the exercise of its police power, to the same extent and in the same manner as though such liquids or liquors had been produced in such state or territory, whether imported in the original package or not. These acts were passed by the Congress to insure to the state complete control over intoxicating liquor, and remove from liquor shipped into a state the protection of the Interstate Commerce Clause, and make it subject at once to state regulation, in spite of the original package decisions.

As stated in Re Rahrer, 140 U.S. 545, at page 560, 11 S.Ct. 865, 35 L.Ed. 572, Congress simply declared that liquor upon arrival in the state shall fall within the category of domestic articles of a similar nature. And in Clark Distilling Co. v. Western Maryland Ry. Co. and State of West Virginia, 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326, L.R.A.1917B, 1218, Ann.Cas. 1917B, 845, the Supreme Court held the Webb-Kenyon Act, 27 U.S.C.A. § 122, withdrew from the immunity of interstate commerce liquor shipped into a state for personal use, contrary to state law, and withdrew from shipments of liquor into states having prohibition the immunity of interstate commerce.

The most serious contention made, and one which has given the court the most trouble, is the argument that intoxicating liquor once delivered to a wholesaler in Colorado ceases to be in interstate commerce, and that agreements fixing the prices of liquor by such wholesalers and retailers within the state do not constitute violations of the Sherman Act, because interstate commerce has ceased prior to such sales.

The indictment, however, charges in effect that the fixing of the prices of the liquor after it had come into possession of the wholesalers in Colorado, was the result of a combination entered into by the producers in other states and the wholesalers and retailers in Colorado prior to the shipment of the liquors in question from the producer outside the state to the wholesalers and retailers within the state, for distribution to consumers. The producers are named as conspirators, and are included in the term "all of the defendants" used in paragraph 22 of the indictment.

It is also charged that the local defendants; that is the defendant wholesalers, and other members of the defendant wholesale association, and the retailers, undertook to induce and compel the defendant producers to enter into the producer-wholesaler fair trade contracts affecting the various brands of liquor shipped by the producers into Colorado, and thereby establish arbitrary and artificial wholesale prices embodying the arbitrary and non-competitive mark-up margins of profits agreed upon. In other words, the producers who manufacture and ship the liquor from outside of Colorado into the state, are directly charged with entering into the agreements to fix the price of the liquor after arrival here.

■ It is further alleged in paragraph 23(e), that the defendants—including the producers—agreed to sell only at prices not lower, and at wholesale discounts not higher, than those established by said contracts, and that the wholesalers agreed among themselves, and with the producers, that any wholesalers selling at other prices would be deprived of the opportunity to purchase such spirituous liquor and wines from defendant producers. This was a means adopted to enforce the unlawful conspiracy, and a direct interference with interstate commerce, and constituted, as stated in Local 167 of International Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers v. United States, 291 U.S. 293, 297, 54 S.Ct. 396, 78 L.Ed. 804, a burden on interstate commerce at the point of origin, and before the interstate journey began, and in the state of destination where the interstate movement ended, and thus operated directly to restrain and monopolize interstate commerce. That case further held (page 297 of 291 U.S., page 398 of 54 S.Ct., 78 L.Ed. 804):

"The Sherman Act denounces every conspiracy in restraint of trade including those that are to be carried on by acts constituting intrastate transactions."

In the Darby case, 312 U.S. 100, page 114, 61 S.Ct. 451, page 457, 85 L.Ed. 609, 132 A.L.R. 1430, it was held: "The power of Congress over interstate commerce 'is complete in itself, may be exercised to its

utmost extent, and acknowledges no limitations, other than are prescribed in the constitution.' * * * That power can neither be enlarged nor diminished by the exercise or non-exercise of state power. * * * Such regulation is not a forbidden invasion of state power merely because either its motive or its consequence is to restrict the use of articles of commerce within the states of destination and is not prohibited unless by other Constitutional provisions."

Page 118 of 312 U.S., page 459 of 61 S.Ct.: "The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce."

Page 119 of 312 U.S., page 459 of 61 S.Ct.: "But it does not follow that Congress may not by appropriate legislation regulate intrastate activities where they have a substantial effect on interstate commerce. * * * But long before the adoption of the National Labor Relations Act [29 U.S.C.A. § 151 et seq.], this Court had many times held that the power of Congress to regulate interstate commerce extends to the regulation through legislative action of activities intrastate which have a substantial effect on the commerce or the exercise of the Congressional power over it."

Page 121 of 312 U.S., page 460 of 61 S.Ct.: "A familiar like exercise of power is the regulation of intrastate transactions which are so commingled with or related to interstate commerce that all must be regulated if the interstate commerce is to be effectively controlled."

And page 122 of 312 U.S., page 461 of 61 S.Ct.: "The Sherman Act and the National Labor Relations Act are familiar examples of the exertion of the commerce power to prohibit or control activities wholly intrastate because of their effect on interstate commerce."

■ It follows from these cases that the Sherman Act is broad enough to denounce restraints of trade carried out by acts themselves constituting intrastate transactions. See, also, Dr. Miles Medical Co. v. John D. Park & Sons, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502. There the Court said that the agreement in question between druggists and jobbers and the retail druggists (page 400 of 220 U.S., page 381 of 31 S.Ct.): "relate directly to interstate as well as intrastate trade, and operate to restrain trade or commerce among the several states, is also clear."

See also United States v. General Motors Corp., 7 Cir., 121 F.2d 376. It is said, page 402 of 121 F.2d: "It is well settled that the federal government may under the Sherman Act regulate local commerce which is intimately related to interstate commerce or local activity which obstructs or burdens interstate commerce." (Citing cases.)

For the latest expression of the Supreme Court on this question see United States v. Univis Lens Co., 316 U.S. 241, at page 252, 62 S.Ct. 1088, at page 1094, 86 L.Ed. 1408: "Agreements for price maintenance of articles moving in interstate commerce are, without more, unreasonable restraints within the meaning of the Sherman Act because they eliminate competition."

And United States v. Masonite Corp., 316 U.S. 265, page 276, 62 S.Ct. 1070, page 1076, 86 L.Ed. ——, stated: "The fixing of prices by one member of a group pursuant to express delegation, acquiescence, or understanding is just as illegal as the fixing of prices by direct, joint action."

And this, irrespective of the fact that the combination may increase the distribution of the particular article in question without an increased price to the consumer; or the fact that from other points of view the arrangements might be deemed to have desirable consequences, would be no more a legal justification of price-fixing than were the "competitive evils" in the Socony-Vacuum case (United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129).

If we stop to consider the factual situation we find, as pointed out, that the producer who manufactured liquor outside of Colorado was a member of the conspiracy, the object of which was to compel him to agree to the price scale fixed by the local wholesalers and retailers in Colorado, and which affected the shipment of the producers' goods from the instant they entered interstate commerce en route to Colorado, and before they became at rest in the wholesalers' warehouses.

In 112 F.2d 417, 422, the court said in the Hayes case (Hayes v. United States, 10

Cir.), speaking of the 21st Amendment: "We do not regard it as a surrender of the power of Congress to prohibit or regulate the transportation of intoxicating liquor in interstate commerce."

■ It is contended that the defendants acted under the provisions of Colorado law. We find no act in Colorado authorizing a conspiracy to fix prices to the injury of competitors. In fact § 6 of the liquor code as amended, '35 C.S.A.Supp. c. 89, § 20, specifically provides that "nothing herein shall be construed as delegating unto the licensing authority the power to fix prices."

Section 1 of the State Fair Trade Act, '35 C.S.A. (1940 Cumulative Supplement Pocket Part, Vol. 4, c. 165, § 20(1), refers only to the resale of commodities which are in free and open competition with commodities of the same general class produced or distributed by others. Here the burden of the Government's charge is that the defendants by the agreements in question have attempted to eliminate competition in their trade-mark brands.

■ It is a well-established rule of our jurisprudence that acts consisting of a combination calculated to cause damage to others may be unlawful, and the power to punish such acts when done maliciously cannot be denied because they are to be followed and worked out by conduct which might have been lawful, if not preceded by the acts.

"The most innocent and constitutionally protected of acts or omissions may be made a step in a criminal plot, and, if it is a step in a plot, neither its innocence nor the Constitution is sufficient to prevent the punishment of the plot by law." Loewe v. Lawlor, 208 U.S. 274, at page 299, 28 S.Ct. 301, at page 307, 52 L.Ed. 488, 13 Ann.Cas. 815.

"Intent may make an otherwise innocent act criminal, if it is a step in a plot." Badders v. United States, 240 U.S. 391, at page 394, 36 S.Ct. 367, at page 368, 60 L.Ed. 706.

"But the character of every act depends upon the circumstances in which it is done." Aikens v. Wisconsin, 195 U.S. 194, at pages 205, 206, 25 S.Ct. 3, 49 L.Ed. 154, cited with approval in Schenck v. United States, 249 U.S. 47, at page 52, 39 S.Ct. 247, at page 249, 63 L.Ed. 470.

■ The law of these decisions is that the Congressional power over interstate commerce includes conspiracies to be carried out solely by intrastate transactions; that the power of Congress over interstate commerce is complete in itself and can neither be enlarged nor diminished by the exercise or non-exercise of state power, and extends to intrastate activities which affect interstate commerce. The power of Congress to regulate interstate commerce extends to the regulation of intrastate activities having a substantial effect on the commerce or the Congressional power over it. And finally in case of conflict state power must give way to Federal.

This would seem to answer all of the contentions made in support of the several demurrers and motions to quash and require their overruling.

It is so ordered.