## UNITED STATES v. FRANKFORT DISTILLERIES, INC.

NO. 523.

Argued February 8, 1945.—Decided March 5, 1945.

*Mr. Edward H. Levi*, with whom *Solicitor General Fahy, Assistant Attorney General Berge, Messrs. Charles H. Weston* and *Matthias N. Orfield* were on the brief, for the United States.

*Mr. Robert S. Marx*, with whom *Messrs. Thomas Kiernan, Newell W. Ellison, A. H. Stuart, C. Frank Reavis* and *George R. Beneman* were on the brief, for respondents.

MR. JUSTICE BLACK delivered the opinion of the Court.

Respondents are producers, wholesalers, and retailers, of alcoholic beverages, who were indicted in a federal district court for having conspired and combined to restrain commerce in violation of § 1 of the Sherman Act as amended. 26 Stat. 209; 50 Stat. 693. Their demurrers and motion to quash having been overruled, respondents pleaded nolo contendere to one count of the indictment. On these pleas they were adjudged guilty by the District Court and fined. 47 F. Supp. 160. The Circuit Court of Appeals reversed, on the ground that the indictment failed to show that the conspiracy charged was in restraint of

interstate commerce. 144 F. 2d 824. The importance of the questions involved prompted us to grant certiorari.[1]

The indictment alleged that 98% of the spirituous liquors and 80% of the wines consumed in Colorado were shipped there from other states. The annual shipments into the state were 1,150,000 gallons of liquors and 800,000 gallons of wine. Seventy-five percent of these beverages were handled by the defendant wholesalers. Respondents were charged with conspiring, in violation of the Sherman Act, to raise, fix and maintain the retail prices of all these beverages by raising, fixing, and stabilizing retail markups and margins of profit.

To accomplish the objects of the conspiracy, it is alleged that they adopted the following course of action. All of the respondents agreed amongst themselves to (1) discuss, agree upon and adopt arbitrary non-competitive retail prices, markups, and margins of profit; (2) defendant retailers and wholesalers agreed to persuade and compel producers to enter into fair trade contracts on every type and brand of alcoholic beverage shipped into the state, thereby to establish arbitrarily high and non-competitive retail markups and margins of profit, agreed upon by defendants; (3) the retailers were to prepare and adopt forms of fair trade contracts, and agree with producers and wholesalers upon these forms; (4) a boycott program was adopted by all of the defendants under which retailers would refuse to buy any of the beverages sold by wholesalers or producers who refused to enter into or enforce compliance with the terms of the price-fixing agreements, and non-complying retailers would be denied an opportunity to buy the goods of the defendant producers and wholesalers. Machinery was set up to make the boycott program effective.

---

[1] 323 U. S. 699.

The facts alleged in the indictment, which stand admitted on demurrer, and on the plea of nolo contendere, indicate a pattern which bears all the earmarks of a traditional restraint of trade. The participants are producers, middlemen, and retailers. They have agreed among themselves to adopt a single course in making contracts of sale and to boycott all others who would not adopt the same course.

The effect, and if it were material, the purpose of the combination charged, was to fix prices at an artificial level. Such combinations, affecting commerce among the states, tend to eliminate competition, and violate the Sherman Act per se. *United States* v. *Socony Vacuum Co.*, 310 U. S. 150, 223–224. Price maintenance contracts fall under the same ban, *Ethyl Gasoline Corp.* v. *United States*, 309 U. S. 436, 458, except as provided by the 1937 Miller-Tydings Amendment to the Sherman Act. 50 Stat. 693. The combination charged against respondents does not fall within this exception. It permits the seller of an article which bears his trade mark, brand, or name, to prescribe a minimum resale price by contract, if such contracts are lawful in the state where the resale is to be made and if the trade-marked article is in free and open competition with other articles of the same commodity. This type of "Fair Trade" price maintenance contract is lawful in Colorado. Session Laws of Colorado, 1937, Chap. 146. But the Miller-Tydings Amendment to the Sherman Act does not permit combinations of businessmen to coerce others into making such contracts, and Colorado has not attempted to grant such permission. Both the federal and state "Fair Trade" Acts expressly provide that they shall not apply to price maintenance contracts among producers, wholesalers and competitors. It follows that whatever may be the rights of an individual producer under the Miller-Tydings Amendment to make price maintenance contracts or to refuse to sell his goods to those who

will not make such contracts, a combination to compel price maintenance in commerce among the states violates the Sherman Act. *United States* v. *Bausch & Lomb Co.,* 321 U. S. 707, 719–723. *United States* v. *Univis Lens Co.,* 316 U. S. 241, 252–253. Consequently, respondents were properly convicted, unless as they argue, their conduct is not covered by the Sherman Act, either because the price fixing applied only to retail sales which were wholly intrastate, or because the state's power to control the liquor traffic within its boundaries makes the Sherman Act inapplicable.

These two questions thus posed relate to the extent of the Sherman Act's application to trade restraints resulting from actions which take place within a state. In resolving them, there is an obvious distinction to be drawn between a course of conduct wholly within a state and conduct which is an inseparable element of a larger program dependent for its success upon activity which affects commerce between the states. It is true that this Court has on occasion determined that local conduct could be insulated from the operation of the Anti-Trust laws on the basis of the purely local aims of a combination, insofar as those aims were not motivated by the purpose of restraining commerce, and where the means used to achieve the purpose did not directly touch upon interstate commerce. The cases relied upon by respondents [2] fall within this category. All of them involved the application of the Anti-Trust laws to combinations of businessmen or workers in labor disputes, and not to interstate commercial transactions. On the other hand, the sole ultimate object of respondents' combination in the in-

---

[2] *Industrial Association of San Francisco* v. *United States,* 268 U. S. 64; *Levering & Garrigues Co.* v. *Morrin,* 289 U. S. 103; *United Leather Workers* v. *Herkert & Meisel Trunk Co.,* 265 U. S. 457; cf. *Local 167* v. *United States,* 291 U. S. 293, 297, and *United States* v. *Hutcheson,* 312 U. S. 219.

stant case was price fixing or price maintenance. And with reference to commercial trade restraints such as these, Congress, in passing the Sherman Act, left no area of its constitutional power unoccupied; it "exercised all the power it possessed." *Apex Hosiery Co. v. Leader,* 310 U. S. 469, 495.

The fact that the ultimate object of the conspiracy charged was the fixing or maintenance of local retail prices, does not of itself remove it from the scope of the Sherman Act; retail outlets have ordinarily been the object of illegal price maintenance.[3] Whatever was the ultimate object of this conspiracy, the means adopted for its accomplishment reached beyond the boundaries of Colorado. The combination concerned itself with the type of contract used in making interstate sales; its coercive power was used to compel the producers of alcoholic beverages outside of Colorado to enter into price-maintenance contracts. Nor did the boycott used merely affect local retail business. Local purchasing power was the weapon used to force producers making interstate sales to fix prices against their will. It may be true, as has been argued, that under Colorado law, retailers are prohibited from buying from out-of-state producers, but this fact has no relevancy. The power of retailers to coerce out-of-state producers can be just as effectively exercised through pressure brought to bear upon wholesalers as though the retailers brought such pressure to bear directly upon the producers. And combinations to restrain, by a boycott of those engaged in interstate commerce, through such indirect coercion is prohibited by the Sherman Act.[4]

---

[3] See, e. g., *Dr. Miles Medical Co. v. Park & Sons Co.,* 220 U. S. 373, 404; *Ethyl Gasoline Corp. v. United States,* 309 U. S. 436; *United States v. Univis Lens Co.,* 316 U. S. 241, 244, 245.

[4] *Fashion Originators' Guild v. Federal Trade Commission,* 312 U. S. 457, 465; *Loewe v. Lawlor,* 208 U. S. 274.

It is argued that the Twenty-first Amendment to the Constitution bars this prosecution. That Amendment bestowed upon the states broad regulatory power over the liquor traffic within their territories.[5] It has not given the states plenary and exclusive power to regulate the conduct of persons doing an interstate liquor business outside their boundaries. Granting the state's full authority to determine the conditions upon which liquor can come into its territory and what will be done with it after it gets there, it does not follow from that fact that the United States is wholly without power to regulate the conduct of those who engage in interstate trade outside the jurisdiction of the State of Colorado.

The Sherman Act is not being enforced in this case in such manner as to conflict with the law of Colorado. Those combinations which the Sherman Act makes illegal as to producers, wholesalers and retailers are expressly exempted from the scope of the Fair Trade Act of Colorado, and thus have no legal sanction under state law either.[6] We therefore do not have here a case in which the Sherman Act is applied to defeat the policy of the state. That would raise questions of moment which need not be decided until they are presented. The judgment of the Cir-

---

[5] *Carter* v. *Virginia*, 321 U. S. 131; *Ziffrin, Inc.* v. *Reeves*, 308 U. S. 132, 138; *State Board* v. *Young's Market Co.*, 299 U. S. 59.

[6] The Colorado Fair Trade Act, 1937 Col. Session Laws, Ch. 146, provides that under certain conditions sellers of commodities can contract with buyers not to resell, and to require subsequent purchasers not to resell, at less than the minimum price stipulated by the seller. But that Act specifically provides that it shall not apply to horizontal agreements, "to any contract or agreement between or among producers or between or among wholesalers or between or among retailers as to sale or resale prices." The Colorado Unfair Practices Act, 1941 Col. Session Laws, Ch. 227, amending and reenacting 1937 Col. Session Laws, Ch. 261, makes it unlawful to sell goods below cost to injure or destroy competition, and states that the express purpose of the Act is "to safeguard the public against . . . monopolies and to foster and encourage competition."

cuit Court of Appeals is reversed and that of the District Court is affirmed.

*It is so ordered.*

The CHIEF JUSTICE took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, concurring.

The Twenty-first Amendment made a fundamental change, as to control of the liquor traffic, in the constitutional relations between the States and national authority. Before that Amendment—disregarding the interlude of the Eighteenth Amendment—alcohol was for constitutional purposes treated in the abstract as an article of commerce just like peanuts and potatoes. As a result, the power of the States to control the liquor traffic was subordinated to the right of free trade across state lines as embodied in the Commerce Clause. The Twenty-first Amendment reversed this legal situation by subordinating rights under the Commerce Clause to the power of a State to control, and to control effectively, the traffic in liquor within its borders. The course of legal history which made necessary the Twenty-first Amendment in order to permit the States to control the liquor traffic, according to their notions of policy freed. from the restrictions upon state power which the Commerce Clause implies as to ordinary articles of commerce, was summarized in my concurring opinion in *Carter* v. *Virginia,* 321 U. S. 131, 139.

As a matter of constitutional law, the result of the Twenty-first Amendment is that a State may erect any barrier it pleases to the entry of intoxicating liquors. Its barrier may be low, high, or insurmountable. Of course, if a State chooses not to exercise the power given it by the Twenty-first Amendment and to continue to treat intoxicating liquors like other articles, the operation of the Commerce Clause continues. Since the Commerce Clause

is subordinate to the exercise of state power under the Twenty-first Amendment, the Sherman Law, deriving its authority from the Commerce Clause, can have no greater potency than the Commerce Clause itself. It must equally yield to state power drawn from the Twenty-first Amendment. And so, the validity of a charge under the Sherman Law relating to intoxicating liquors depends upon the utilization by a State of its constitutional power under the Twenty-first Amendment. If a State for its own sufficient reasons deems it a desirable policy to standardize the price of liquor within its borders either by a direct price-fixing statute or by permissive sanction of such price-fixing in order to discourage the temptations of cheap liquor due to cutthroat competition, the Twenty-first Amendment gives it that power and the Commerce Clause does not gainsay it. Such state policy can not offend the Sherman Law even though distillers or middlemen agree with local dealers to respect this policy. If an agreement among local dealers not to buy liquor through channels of interstate commerce does not offend the Sherman Law though a like agreement as to other commodities would, an agreement among liquor dealers to abide by state policy for a uniform price—which is far less restrictive of interstate commerce than a comprehensive boycott—can hardly be a violation of the Sherman Law.

Thus the question in this case, as I see it, is whether in fact the policy of Colorado sanctions such an arrangement as the indictment charges. Such a policy may be expressed either formally by legislation or by implied permission. Unless state policy is voiced either by legislation or by state court decisions, it is precarious business for an outsider to be confident about the legal policy of a State. So far as our attention has been called to materials relevant for ascertaining the policy of Colorado toward such a price arrangement as is here charged, it would be temerarious to suggest that Colorado does sanction it. Indeed, the leg-

islation of Colorado looks in the opposite direction. And we have no guidance from state decisions to suggest that the apparent condemnation of such an arrangement under the Colorado Fair Trade Act, § 2, Colo. Stat. Ann., ch. 165, § 20 (2), does not condemn the price arrangements before us. Although the Attorney General of Colorado has filed a brief as *amicus curiae* on the side of the respondents, his argument is not based on the contention that the policy of Colorado sanctions that which it is claimed the Sherman Law forbids. In the view I take of the matter, if a State authorized the transactions here complained of, the Sherman Law could not override such exercise of state power. For, in any event, if state policy did so authorize it, conformity with the state policy could not be deemed an "unreasonable" restraint of interstate commerce. But I do not find that Colorado has done so.

The decision of the court below is not without support in what has been said in the past in holding that, apart from the Twenty-first Amendment, this was a restraint local in its nature and therefore outside the scope of the Sherman Law. But price-fixing is such an immediate restraint upon trade that I do not think that the reach of the consequences of such an obvious restraint should be determined by drawing too nice lines as a matter of pleading. The case is before us, in effect, on demurrer to the indictment and judged abstractly, as a matter of pleading, I cannot say that the indictment was demurrable.

MR. JUSTICE ROBERTS concurs in this opinion.