EMERSON RADIO & PHONOGRAPH CORP., Plaintiff, *v.* STANDARD APPLIANCES, INC., Defendant.

Supreme Court, Special Term, New York County, June 25, 1951.

*Paul, Weiss, Rifkind, Wharton & Garrison* for plaintiff.

*Samuel J. Ernstroff* for defendant.

ISIDOR WASSERVOGEL, Official Referee. This is an action brought by plaintiff pursuant to the Feld-Crawford Act (General Business Law, art. XXIV-A, as added by L. 1935, ch. 976), wherein it seeks an injunction restraining and enjoining the defendant from advertising, displaying, offering for sale and selling plaintiff's trade-marked products at prices below those set forth in so-called " fair trade agreements ".

Plaintiff, a New York corporation, is a manufacturer of radio and television receivers which bear the trade-mark "Emerson." Pursuant to a contract with plaintiff, Emerson-New York, Inc. (hereinafter referred to as Emerson), the exclusive distributor of plaintiff's products in the Metropolitan area, entered into fair-trade agreements with retailers, whereby such retailers were to sell plaintiff's products at prices fixed by the manufacturer. It is plaintiff's contention that United Radio Stores, Inc., a predecessor of the defendant corporation, signed a fair-trade agreement with Emerson and that the defendant, which allegedly acquired all of the assets and liabilities of this firm, is bound by such agreement. Plaintiff further contends that inasmuch as Emerson is engaged in intrastate commerce, defendant, even as a "non-signer," is liable under the provisions of the Feld-Crawford Act. The defendant contends, however, that plaintiff is engaged in interstate commerce and, as a "non-signer," it is not bound by plaintiff's price regulations by virtue of the recent United States Supreme Court decision in *Schwegmann Bros.* v. *Calvert Distillers Corp.* (341 U. S. 384).

The primary issue to be resolved by the court is whether the defendant is bound by contract to enforce the prices fixed by the plaintiff manufacturer. If it be determined that the defendant has assumed the obligations of the fair-trade agreement entered into by United Radio Stores, Inc. with Emerson, it will then be immaterial whether interstate or intrastate commerce is involved, inasmuch as the decision in the *Schwegmann* case (*supra*) does not invalidate or affect fair-trade contracts entered into by retailers of trade-marked merchandise. The action being in equity, the court, nevertheless, will determine the issue as to whether interstate or intrastate commerce is involved as well as all others raised by the pleadings.

The parties concede that plaintiff itself, as the manufacturer of the trade-marked products, is engaged in interstate commerce. Plaintiff contends, however, that Emerson, its distributor, which entered into the fair-trade agreements with the retailers in New York City, is engaged only in intrastate commerce. Plaintiff asserts that inasmuch as Emerson sells to local retailers, who, in turn, sell to local consumers, the activity with which this action is concerned takes place solely within the State of New York, and is, therefore, not subject to the Sherman Anti-Trust Act (U. S. Code, tit. 15, § 1 *et seq.*). With this contention I do not agree.

Although price-fixing agreements by a plaintiff engaged in interstate commerce may purport to affect only resales within the State of New York, it does not follow that they do not involve interstate commerce which bring the transactions within the scope of the Sherman Act (*Bulova Watch Co.*, v. *S. Klein on the Square, Inc.*, 199 Misc. 818). As heretofore stated plaintiff has conceded that as a manufacturer it is engaged in interstate commerce. It is the trade-mark which appears on products sold throughout the country that plaintiff seeks to protect. To this end, it has entered into fair-trade agreements similar to the one it seeks to enforce herein with dealers throughout the United States. Furthermore, in addition to the testimony which shows that the defendant sells plaintiff's products to consumers in States other than New York, the record clearly establishes that a substantial number of the television sets supplied by the plaintiff to Emerson were manufactured and shipped from New Jersey to New York. In view of these facts, I hold that the parties are so engaged in interstate commerce as to bring them within the scope of the Sherman Act (*Mandeville Is. Farms* v. *American Crystal Sugar Co.*, 334 U. S. 219, 234; *United States* v. *Frankfort Distilleries*, 324 U. S. 293, 296). It necessarily follows, therefore, that unless the defendant be deemed contractually obligated to adhere to the fixed prices established by plaintiff, the principles enunciated by the United States Supreme Court in the *Schwegmann* case (*supra*) are applicable to the instant action.

It is not disputed that on October 30, 1945, United Radio Stores, Inc. (hereafter referred to as United No. 1) entered into a fair trade agreement with Emerson. On July 15, 1946, United No. 1 was purportedly dissolved. On July 22, 1946, just seven days thereafter, a new corporation was formed which likewise was named United Radio Stores, Inc. (hereafter referred to as United No. 2). The two principal stockholders, directors and officers of United No. 1 became the principal stockholders, directors and officers of United No. 2. It appears from the record that neither the dissolution of United No. 1 nor the incorporation of United No. 2 was known to anyone connected with plaintiff or Emerson until the trial of this action. Furthermore, there is no proof in the record that United No. 1 or United No. 2 advised anyone of any purported change in the corporate structure. After the dissolution, United No. 2 kept the same telephone number and business address, used the same business stationery as United No. 1, and even failed to inform the public utility companies (telephone, gas and electric) that they were

servicing a new corporation. It is apparent, therefore, that United No. 2 intended to and succeeded in deceiving the public as well as plaintiff and Emerson into believing that it was the same corporation as United No. 1. As a matter of fact, one Fink, an officer, director and stockholder of United No. 1 and United No. 2 advised Emerson on July 25, 1946, that "as of this date * * * Zeller is *no longer* connected * * * *with this concern.*" The credible testimony, however, shows that Fink failed to tell Emerson that United No. 1 had been dissolved and that said Zeller, a former associate in United No. 1, had not acquired any interest in the new corporation. Fink made it appear that Zeller merely terminated his association with the corporation, which to all outward appearances still continued in active business as United No. 1. It is entirely possible that this artifice may not have been directed primarily at Emerson or the plaintiff, but nevertheless Emerson was deceived by the resulting misrepresentation which it relied upon to its detriment. It is an elementary principle of law that when one party to a transaction has by his representations, either express or which may fairly be implied from his conduct or silence, obtained an unfair advantage over the other, a court of equity will not permit him to avail himself of it (Pomeroy on Equity Jurisprudence, [5th ed.], § 801, *et seq.*; Clark on Equity, § 29, p. 34, and New York cases cited thereunder). Under these circumstances I hold that United No. 2 is estopped from asserting any claim that it was not a party to United No. 1's contract with Emerson. In any event, there is sufficient evidence in the record to warrant the conclusion that United No. 2 assumed all of the assets and liabilities of its predecessor, United No. 1.

In 1950, United No. 2 was consolidated and merged with the defendant Standard Appliances, Inc. As a result of such consolidation and merger, the defendant acquired all of the assets and liabilities of United No. 2. It having been determined that United No. 2 was subject to Emerson's fair-trade agreement, it follows by operation of law that the defendant, as the surviving corporation of a consolidation with United No. 2, likewise is vested with the obligations set forth in such agreement (see Stock Corporation Law, §§ 86, 88–90).

As a retailer of plaintiff's products who is subject to prices fixed by plaintiff, defendant's advertisement of May 3, 1951, wherein it offered for sale trade-marked television sets below list price, constituted a breach of its fair-trade agreement with Emerson. Contrary to defendant's contention, there is nothing in the record which establishes that Emerson breached the fair-

trade agreement in 1950 by refusing to deal with the defendant. There is no evidence that plaintiff or Emerson ever refused to fill an order placed by the defendant while it was an accredited dealer. The record merely discloses that the defendant permitted its franchise to lapse. The termination of the franchise does not in any event terminate defendant's contractual liability under the fair-trade agreement, which, on its face, has its own termination procedure. Such procedure could have been employed by the defendant at any time, had it so desired. The defendant, however, at no time gave Emerson the required notice that it elected to terminate their agreement.

Defendant's contention that the fair-trade agreement bars an assignment thereof without the consent of Emerson and that such consent had not been given is of no merit to the instant action. The provision referred to by the defendant is solely for the benefit of Emerson, which, therefore, can waive such right of approval and hold the assignee of the agreement liable for any infringement thereof. In any event, as heretofore stated, Emerson was never advised of the assignment of the fair-trade agreement from United No. 1 to United No. 2 because of the deception and misrepresentation practiced by United No. 2. Emerson, therefore, could not have either approved or disapproved any assignment or transfer of the rights under its fair-trade agreement. Furthermore, insofar as the transfer of any rights were concerned, by virtue of the subsequent consolidation and merger of United No. 2 with the defendant corporation under the provisions of the Stock Corporation Law, no affirmative action of approval or disapproval had to be exercised by Emerson.

The defendant asserts that plaintiff and Emerson have failed to enforce compliance with their price structure and that, therefore, plaintiff comes into a court of equity with unclean hands. The record shows that almost all of Emerson's 450 retailers who were franchised Emerson dealers have executed fair-trade contracts. An examination of the record does not support defendant's claim that there was or is widespread noncompliance with the fixed prices of television sets. Of these 450 dealers, price cutting has been attributed by the defendant to approximately 10 dealers. Although representatives of several retail stores testified that it was their practice to cut Emerson prices, the defendant has failed to prove that such conduct was ever brought to the attention of plaintiff or Emerson. The credible testimony and other evidence show that as Emerson learned of infractions of its agreements, it acted promptly and in most instances suc-

cessfully to secure compliance with the fixed prices. Although plaintiff and its local distributor may not have succeeded in enforcing universal adherence to its fair-trade agreements, they have made sufficient reasonable enforcement efforts to warrant the aid of a court of equity.

Defendant maintains that Emerson has condoned the practice of several of its dealers in the granting of trade-in allowances on the purchase of new Emerson products. While it was shown that such practice does exist, there is no proof to warrant the conclusion that it has been abused or misused by any dealer or retailer. Nothing in the Feld-Crawford Act or in the fair-trade agreements prevents a retailer from accepting payment wholly or partly in kind, whether that payment be in the form of an old phonograph, radio or television set. In the absence of any evidence that a retailer has given or gives fictitious or unwarranted allowances, such trade-in allowances in no way affect the maintenance by Emerson of its fair-trade structure.

Defendant charges that plaintiff and Emerson have discriminated among the various dealers and retailers in the Metropolitan area. The record, however, does not support this claim. Contrary to defendant's contention, it is not incumbent upon plaintiff or Emerson to institute immediate, simultaneous legal action against all violators. A letter or telephone call, for example, rather than the service of a summons, may suffice to restrain future violations. Likewise, in our complex society, the enforcement of a fair-trade structure cannot be as rigidly supervised as the defendant suggests. It is apparent that undetected violators and surreptitious cut-price sales cannot be supervised or controlled. The fact that there may be some violators who have not been proceeded against is not in and of itself sufficient as a matter of law to defeat the right to an injunction against one particular violator (*Automotive Elec. Service Corp.* v. *Times Square Stores Corp.*, 175 Misc. 865, 872).

Defendant's contention that plaintiff and Emerson conspired with certain of their dealers is specious. No proof has been adduced upon the trial that indicates that plaintiff or Emerson favor any particular dealer or that they treat any dealer differently than all others. There is uncontradicted evidence that any differential in the price of plaintiff's trade-marked products to various retailers throughout the Metropolitan area is based on sales volume and the reduced cost of handling quantity shipments to such retailers. This does not constitute unfair discrimination, inasmuch as all dealers were advised of the differ-

entials available to them if they qualified therefor on the basis of certain fixed volume of sales.

Upon the evidence before me, therefore, I hold that the defendant, in violation of its fair-trade agreement with Emerson offered for sale plaintiff's products at prices below those set forth in such agreement. It necessarily follows that plaintiff is entitled to the injunctive relief it seeks herein.

The court is aware that, as the defendant notes, "non-signers" of Emerson's fair-trade agreements are free to cut prices on Emerson products because of the decision in the *Schwegmann* case (*supra*), while the defendant is now compelled to adhere to fixed price schedules. The legislative policy enunciated by the Feld-Crawford Act in this State has not been repealed, and the court, therefore, is constrained to hold that any inequality which now results from the application of such act must, nevertheless, be enforced until such legislative edict is amended or repealed.

Judgment is rendered for the plaintiff restraining and enjoining the defendant from advertising, displaying, offering for sale and selling any of plaintiff's trade-marked products at prices below those set forth in the fair-trade agreement.

No damages are awarded.

Submit decree on or before July 2, 1951, on two days' notice.

The above constitutes the decision of the court as required by section 440 of the Civil Practice Act.