ADOLPH ROTHBAUM, Respondent, *v.* R. H. MACY & Co., INC., Appellant.

Second Department, July 7, 1952.

*Kenneth M. Spence, Donald B. Smiley* and *Julius J. Teller* for appellant.

*Lewis L. Fawcett, Emil Greenberg, Bernhardt M. Meisels, Matthew Salonger* and *Abraham Sarason* for respondent.

*Per Curiam.* The defendant appeals from a judgment which perpetually enjoins it from advertising, offering for sale or selling at retail within New York State at less than established and stipulated retail prices in fair trade agreements any of the commodities manufactured by ten producers and distributed and sold by them and bearing their brands or trade-marks. The judgment was rendered upon a written stipulation of facts and exhibits submitted to the court at Special Term, which held that some of the stipulated facts were not relevant to the issues.

Plaintiff is a retail druggist and has a drug store in Jamaica, New York. He is a signatory to fair trade agreements with each of the ten manufacturers or distributors. He brought this action under the General Business Law (§ 369-a, *et seq.* [Feld-Crawford Act]) against defendant, which operates five department stores in New York City and Westchester County, as well as department stores in other States, and is not a signatory to any fair trade agreements with the ten producers.

The parties have stipulated that the determination as to Ex-Lax, one of the products, shall apply to the remainder. The answer denied allegations in the complaint which alleges manufacture of the articles and sale thereof to the defendant in this State, and pleads that the various articles are sold in competition with articles of the same class manufactured outside of New York State and shipped in interstate commerce into this State; that the agreements were an integral part of an interstate marketing and price fixing arrangement by which uniform prices are sought to be imposed upon retailers throughout the United States, including nonsigners of such agreements; that the production and distribution of the products and the transactions sought to be enjoined involve and affect interstate commerce and that the defendant had been and was purchasing some quantities of the articles outside of the State of New York.

The stipulation provided that it " is entered into without prejudice to objections by either party as to the relevancy of any of the facts stipulated herein ". Special Term held irrelevant the following stipulated facts: That the article was manufactured in final form in this State from ingredients manufac-

tured outside the State and packaged in containers manufactured outside the State; that the majority of sales made by the manufacturer were made outside the State to wholesalers and retailers at uniform prices; that the manufacturer was a party to identical fair trade agreements in forty-five States, including New York, and has notified the trade in the other forty-four States that it has executed the agreements and has distributed its price lists by mail to such trade; that it has requested all dealers outside of New York, whether signers or not, to abide by said agreements; that it notifies any dealer found to be selling below the fixed price and requests such dealer to abide by the agreement; that the annual sales of Ex-Lax in New York and the other States are in excess of forty million boxes, and Ex-Lax, Inc. has in excess of four thousand direct accounts and most of the sales, and the vast majority of the accounts were outside of this State, and the company maintained an office in San Francisco, at which it sells and distributes Ex-Lax; that it advertises Ex-Lax by radio, drug store signs, in newspapers and magazines of nationwide circulation within the States other than New York; that in 1950 approximately 10% of all merchandise sold by defendant in its largest New York store was sold and delivered to its customers residing outside of this State; that it operated stores in other States and purchased outside of the State of New York part of the merchandise which it sells in New York; that since June 16, 1951 (a date subsequent to the commencement of the action but prior to the service of the answer), the defendant has been buying all Ex-Lax sold by it in its New York stores from jobbers, dealers or wholesalers outside this State and has shipped it into the State and has not bought directly from Ex-Lax, Inc., and the purchases outside of the State have substantially increased; that defendant advertises its merchandise extensively in New York City newspapers, which have a wide circulation inside and outside of this State, and advertises by radio and television in stations in New York and New Jersey, the listening areas of which cover points outside of New York State.

The denials and defenses in the answer, as well as the allegations in the complaint made such facts relevant and they could not be disregarded in arriving at a decision as to the rights of the parties.

It is plaintiff's position that under the settled law of this State, a nonsignatory with knowledge of a fair trade agreement covering an identified product, moving in intrastate commerce, is bound by such fair trade contract. He relies on the rule of

*Bourjois Sales Corp.* v. *Dorfman* (273 N. Y. 167 [1937]) that under the Feld-Crawford Act resale price maintenance contracts are binding upon nonsignatories.

In *Calamia* v. *Goldsmith Bros., Inc.* (299 N. Y. 636; remittitur amended, 299 N. Y. 795 [1949]), the court held that the Feld-Crawford Act and the Miller-Tydings amendment to the Sherman Act (U. S. Code, tit. 15, § 1) permitted suits against nonsignatories relating to commodities in interstate commerce. That case was prior to the decision in *Schwegmann Bros.* v. *Calvert Corp.* (341 U. S. 384 [May 21, 1951]).

In *Schwegmann Bros.* v. *Calvert Corp.* (*supra*) the court reversed an injunction granted to the plaintiff based upon alleged unlawful price cutting. The opinion for reversal pointed out that there were critical differences between Louisiana's law (which is apparently similar to the Feld-Crawford Act) and the Miller-Tydings Act in that the State law permits a provision that the buyer will not resell " ' except at the price stipulated by the vendor ' " (p. 386) (thus permitting the fixing of maximum as well as minimum prices), whereas the Federal Act relates to " minimum " prices. (The Feld-Crawford Act has a provision similar to that of the Louisiana statute, although the prices fixed by the agreements are " minimum " resale prices.) Mr. Justice Douglas pointed out that the Miller-Tydings Act related to contracts or agreements, sanctioned minimum price agreements affecting interstate commerce when permitted by State law, but held that it did not apply to nonsigners. As to the latter, there was no agreement to be sanctioned. They are coerced by the laws. Apparently it was assumed that interstate commerce was involved. In the Circuit Court of Appeals, the majority opinion had stated (184 F. 2d 11, 13): " We agree with appellants that though the sales made by appellants were made intrastate, the transactions, the subject of this suit, so affect interstate commerce and the exertion of the power of congress over it as to bring plaintiffs' activities within the reach of the Sherman Act, unless the Miller-Tydings Amendment to that act excludes them." In that case, the plaintiffs were Maryland and Delaware corporations, distributors of gin and whiskey, who sold their products to wholesalers in Louisiana who in turn sold to retailers. The defendant was a retailer in New Orleans who had refused to agree to the " price-fixing scheme."

Plaintiff urges that the determination of whether New York law is controlling depends upon whether the transactions involved constituted " interstate " or " intrastate " commerce.

The Special Term accepted this test and expressly found that " the transactions complained of were entered into in intrastate commerce ". On this basis the court concluded that *Schwegmann Bros.* v. *Calvert Corp.* (*supra*) was distinguishable because there an interstate marketing arrangement was involved.

The court lost sight of the controlling importance of the Sherman Act to the *Schwegmann* decision and to the determination of the case at bar. Defendant contends that the enforcement of the fixed prices against it, a nonsigner, constitutes an unlawful restraint of trade under section 1 of the Sherman Act. If defendant is correct, it is a complete defense to the action. (*Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373 [1911].) Therefore, the question for decision is whether the Sherman Act extends to the transactions here involved.

The test is not whether the commerce involved in a particular transaction is " interstate " or " intrastate ", but what are the effects upon interstate commerce of the trade practices involved. (*U. S.* v. *Frankfort Distilleries*, 324 U. S. 293 [1945]; *Mandeville Farms* v. *Sugar Co.*, 334 U. S. 219 [1948]; *U. S.* v. *Women's Sportswear Assn.*, 336 U. S. 460 [1949].)

In *U. S.* v. *Frankfort Distilleries* (*supra*), the defendants, producers, wholesalers, and retailers of alcoholic beverages, were charged with conspiring to fix and maintain local retail liquor prices in Colorado. The defendants protested that the price fixing applied only to retail sales which were wholly intrastate. The Supreme Court rejected their protest and stated (pp. 297, 298) : " there is an obvious distinction to be drawn between a course of conduct wholly within a state and conduct which is an inseparable element of a larger program dependent for its success upon activity which affects commerce between the states. It is true that this Court has on occasion determined that local conduct could be insulated from the operation of the Anti-Trust laws on the basis of the purely local aims of a combination, insofar as those aims were not motivated by the purpose of restraining commerce, and where the means used to achieve the purpose did not directly touch upon interstate commerce. * * * On the other hand, the sole ultimate object of respondents' [defendants'] combination in the instant case was price fixing or price maintenance. And with reference to commercial trade restraints such as these, Congress, in passing the Sherman Act, left no area of its constitutional power unoccupied; it ' exercised all the power it possessed.' *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 495."

The Supreme Court has thus declared that the breadth of the Sherman Act in the sphere in which we are now concerned is just as broad as the power of Congress.

In the *Frankfort* case the court found that the means adopted to effect the object of fixing and maintaining retail prices in Colorado " reached beyond the boundaries of Colorado " to force producers outside the State " to enter into price-maintenance contracts " and " to fix prices against their will " (p. 298). These effects of the defendants' control over the local Colorado market unquestionably represented a substantial restraint upon interstate trade. The effects upon interstate trade of the enforcement against the present defendant of the resale price maintenance contracts here involved are not so apparent.

But the Supreme Court has indicated that the effects need not be so direct and apparent. In the *Mandeville Farms* case (334 U. S. 219, *supra*) (a treble damage action brought by beet growers in California based upon a conspiracy by California's three sugar refiners who were alleged to have agreed among themselves to pay a uniform price to the growers for their sugar beets), the court had occasion to sketch the history of the application of the Sherman Act and stated the present law in this way: " In view of this evolution, the inquiry whether the restraint occurs in one phase or another, interstate or intrastate, of the total economic process is now merely a preliminary step, except for those situations in which no aspect of or substantial effect upon interstate commerce can be found in the sum of the facts presented. For, given a restraint of the type forbidden by the Act, though arising in the course of intrastate or local activities, and a showing of actual or threatened effect upon interstate commerce, the vital question becomes whether the effect is sufficiently substantial and adverse to Congress' paramount policy declared in the Act's terms to constitute a forbidden consequence " (p. 234).

The instant plaintiff emphasizes that he is a local retailer competing locally with defendant in the retail drug business and that he seeks only to enforce his own rights under the Feld-Crawford Act. But the rights he claims and seeks to enforce are not his alone. If they exist, they belong equally to the ten manufacturers who executed the fair trade agreements with him. The interests of manufacturer and retailer may be different, but the statutory rights and remedy are the same, and plaintiff's rights are correspondingly subject to all the infirmities attaching to them by virtue of their relation to the manu-

facturers. The restraint of trade produced by enforcement against a nonsigner is the same whether the injunction issues at the behest of the producer or of the storekeeper.

This fact must be borne in mind when considering the facts stipulated by the parties but rejected below as irrelevant. The parties had agreed that the facts stated in regard to the laxative " Ex-Lax ", one of the products named in the complaint, should serve as the basis of the court's decision. The Special Term, as noted, " on the ground that the transactions set forth in the complaint are wholly intrastate ", rejected all references in the stipulated facts to the business of Ex-Lax, Inc., outside New York, the trade in its product outside the State and, most significantly, the interstate marketing arrangements for the sale and distribution of its product.

But how else can the effect upon related areas of interstate commerce of the restraint asked by plaintiff be determined? It is not enough to look solely to the transactions with which plaintiff was concerned, nor to restrict examination to transactions within the State. The controlling issue raised by the pleadings, both by the complaint *and* the answer, is whether the Sherman Act extends its regulation to the restraint here involved. The decisions of the Supreme Court, to which we have referred, state that we cannot stop our investigation, as the Special Term has done; that is " merely a preliminary step ". The presence of a substantial, actual or threatened effect upon interstate commerce is the " vital question ".

The stipulation of facts outlines the nationwide marketing of " Ex-Lax ". We are told that more than forty million boxes are sold annually in the United States, the annual dollar value of these sales exceeding two million dollars. From its place of manufacture in Brooklyn, New York, the product is shipped to retailers and wholesalers throughout the country. The manufacturer has executed " Fair Trade agreements " with retail dealers in forty-four other States — in every State which has a " fair trade " law. These agreements together with those entered into with retailers in New York are all executed upon a standard form contract (Exhibit A to the stipulation). These agreements number 5,460 in New York, 2,800 in Illinois, 140 in Connecticut, 15 in Mississippi and not less than 10 in each of the forty-one remaining States with " fair trade " legislation.

It may be urged that New York clearly predominates and that the business of Ex-Lax, Inc., in New York, constitutes a separable portion of business activity. But if the relative num-

ber of individual agreements in New York has any significance, it would seem to be as an indication of the importance of the trade in New York to the entire business of the company, and the consequent effect of any regulation in New York upon the company's business in other States.

From plaintiff's point of view, the sale of " Ex-Lax " in New York may appear more readily separable from the whole than when viewed from the broader and more significant point of view of the manufacturer, but the limited sphere of plaintiff's interest and his relation to the market in " Ex-Lax " is not controlling as to the effect of the restraint on interstate trade in the product. To the manufacturer, the enforcement of its " fair trade " agreements in New York is merely an integral part of the nationwide program of resale price maintenance for its product. The uniform contract is but one evidence of the unified character of this marketing program.

The parties further stipulated that Ex-Lax, Inc., conducted a nationwide advertising program by radio, drug store signs, newspapers and magazines in furtherance of the marketing of " Ex-Lax " and maintained an office in San Francisco at which it sells and distributes the product. Those facts establish that there was an " interstate marketing arrangement " for the test product, contrary to the conclusion reached by Special Term.

It was on the basis of its finding of an absence of such an arrangement that the court below distinguished the *Schwegmann* case. The necessary implication of the decision in that case is that, so far as retailers of " Ex-Lax " in States other than New York are concerned, nonsigners are not bound by the " fair trade " laws of their respective States to the price maintenance plan. (*Sunbeam Corp.* v. *Wentling,* 192 F. 2d 7 [1951].) In the first *Wentling* decision of the Third Circuit (reported at 185 F. 2d 903), the court denied Sunbeam protection against Wentling, a Pennsylvania mail order house, with respect to interstate sales, but affirmed the granting of an injunction against sales within Pennsylvania at less than the price fixed by Sunbeam. This first decision preceded the *Schwegmann* decision in the Supreme Court, but it struck down the injunction of Wentling's interstate sales on the ground that the commerce clause of the Federal Constitution barred their regulation by Pennsylvania. It was stipulated that " approximately 10% of all merchandise sold " by defendant's Manhattan store " was sold and delivered by it to customers residing outside the State of New York." The stipulation states that as a result of its advertising pro-

gram, defendant made "a substantial number of sales and deliveries of merchandise to customers in States other than New York."

We must conclude the defendant does in fact have some interstate sales. On the authority of the first *Wentling* decision, at least insofar as the injunction granted below restricts these sales, it exceeded the limits of State authority.

Following the *Schwegmann* decision, the *Wentling* case was remanded to the Third Circuit by the Supreme Court with the instruction that it be reconsidered in the light of the *Schwegmann* decision (341 U. S. 944). On remand, the Third Circuit held that Sunbeam was "entitled to no protection at all against Wentling, a non-signer", and dissolved the injunction of Wentling's sales within Pennsylvania (192 F. 2d 7, 8).

Although neither the first nor the second Wentling decision discloses the fact, Sunbeam Corporation, the plaintiff, was an Illinois corporation with its place of manufacture in the vicinity of Chicago. (Moody's Manual of Investments [Industrials-1951], p. 1338.) Thus, the second Wentling decision did not purport to lay down a rule applicable to the case at bar where producer and retailer are both within the same State. Nevertheless, we may conclude from the *Wentling* case that Ex-Lax, Inc., is entitled to no protection against nonsigners outside New York. The question remains, are the domestic producer and signing retailer entitled to protection against a domestic, nonsigning retailer with respect to intrastate sales?

It cannot be assumed from the fact that Ex-Lax, Inc., cannot enforce its resale price maintenance plan against nonsigners outside New York that its price maintenance program no longer exists. The "interstate marketing arrangement" subsists, although shorn of one of its most effective weapons, the power to restrain nonsignatories.

To permit the enforcement of price maintenance within one State while it was denied in the forty-four other States with "fair trade" laws, would introduce an aberration into programs of price maintenance, but in the absence of a substantial effect upon commerce between the States that would not be controlling. However, examination of the effects, actual or threatened, of sustaining an injunction against defendant leads to the conclusion that such restraint has a substantial effect upon commerce and falls within the bar of the Sherman Act and must be dissolved.

The nub of the problem is that the New York sales of Ex-Lax are directly related to sales in other States. Profits realized from "fair trading" in one market can be used to support ineconomic price cutting in another. Pricing policies of one market produce reactions in adjacent markets and send out widening waves of disturbance. The natural flow of commerce across State lines would necessarily be impaired by a distinction resting upon the State of origin. Manufacturers seeking the protection of the "fair trade" law of their State would tend to favor intrastate markets and might even seek to keep their products within their State. Thus a new form of trade barrier between the States would be erected with a direct effect upon interstate commerce.

The manufacturer, Ex-Lax, Inc., and the defendant both engage in interstate commerce to a substantial extent. The manufacturer has a nationwide marketing arrangement for its product, of which the distribution in New York is but a part. These are but connecting links to interstate commerce, but by virtue of them the effect of the restraint sought by plaintiff would be transmitted into the area of regulation of the Sherman Act. Accordingly, the injunction must be dissolved.

This result is in accordance with the decisions of the California and New Jersey Courts, which have heretofore considered the problem.

In *Cal-Dak Co.* v. *Sav-On Drugs, Inc.* (242 P. 2d 333 [Cal.]; April 3, 1952), the District Court of Appeal, Second District, Division 2 California, denied a preliminary injunction to the plaintiff in an action to restrain the defendant from selling a commodity at less than the retail fair trade price and for damages. The trade-marked article was manufactured in California and sold throughout the nation. The defendant, a nonsignatory, purchased the articles in California and sold them in California. The court held that interstate commerce was involved, and stated (p. 336):

"Plaintiff's method of operation when viewed as a whole constitutes interstate commerce. Its product is manufactured in California; its sales are made to jobbers and distributors throughout the United States for resale therein * * *. Thus it is evident that its intrastate and interstate operations are so interlocked it is not possible, so far as their 'effect' on interstate commerce is concerned, to segregate and isolate sales made to California jobbers as distinguished from sales made to

other jobbers and distributors in the various states. All these sales pertain to interstate commerce.

" Plaintiff's argument that the products they seek to enjoin defendant from selling at reduced prices were manufactured in California and never left the state and thus have not entered the stream of interstate commerce is not controlling here since it is sufficient if interstate commerce is influenced by plaintiff's sale to defendant."

In *Hoffmann-La Roche, Inc.*, v. *Weissbard* (19 N. J. Super. 210 [March 31, 1952]) the plaintiff, a New Jersey corporation, brought an action to enjoin the defendants, nonsignatories, owners of local drug stores, from selling articles below the fair trade fixed prices. The plaintiff manufactured the article in New Jersey, did a nationwide business and had executed fair trade price agreements in forty-five States, using the same prices throughout the United States. Prior to the *Schwegmann* case, the defendants purchased plaintiff's articles directly from the plaintiff, but since then they purchased the articles outside the State and they were delivered to the defendant's Jersey stores. The Superior Court of New Jersey, Chancery Division, Essex County, held that an injunction could not be granted, and stated (p. 215) that " At common law in this State, price-fixing agreements were illegal as against public policy." At page 217, the court said: " Quite obviously, in the cases *sub judice*, the transactions were interstate. The merchandise offered for sale in this State was purchased by the defendants outside the State. However, if the defendants had purchased the plaintiffs' products within the State, the Sherman Act would still apply."

The judgment should be reversed on the law, with costs, and the complaint dismissed, without costs. The facts excluded from the stipulation by Special Term are found. The finding in the opinion, which constitutes the decision, that the transactions were solely in intrastate commerce should be reversed.

WENZEL, MACCRATE and SCHMIDT, JJ., concur; ADEL, J., concurs on the ground that the Feld-Crawford Act does not apply to a nonsignatory in respect of an article in interstate commerce; JOHNSTON, Acting P. J., not voting.

Judgment reversed on the law, with costs, and complaint dismissed, without costs. The facts excluded from the stipulation by Special Term are found. The finding in the opinion, which constitutes the decision, that the transactions were solely in intrastate commerce is reversed.