STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 07-1620


WENDELL MANUEL, D/B/A JUNGLE LOUNGE AND RESTAURANT,
 ET AL.

VERSUS

STATE OF LOUISIANA, OFF. OF ALCOHOL AND TOBACCO
CONTROL, ET AL.


**********

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 68791-A
HONORABLE JOHN LARRY VIDRINE, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Marc T. Amy, Billy Howard Ezell, and J. David Painter, Judges.


**AFFIRMED.**


**Anthony Craig Dupre**
**P. O. Drawer F**
**Ville Platte, LA 70586**
**(337) 363-3804**
**Counsel for Plaintiffs/Appellants:**
**B & S Corner Grocery Store, Inc.**
**Wendell Manuel, D/B/A Jungle Lounge and Restaurant**

**Gary J. Ortego**
**Attorney at Law**
**P. O. Drawer 810**
**Ville Platte, LA 70586**
**(337) 363-0707**
**Counsel for Plaintiffs/Appellants:**
**B & S Corner Grocery Store, Inc.**
**Wendell Manuel, D/B/A/ Jungle Lounge and Restaurant**

**Stephanie Bienvenu Laborde**
**Milling, Benson, Woodward**
**339 Florida Street, Suite 300**
**Baton Rouge, LA 70801-1304**
**(225) 291-7300**
**Counsel for Defendants/Appellees:**
**State of Louisiana, Office of Alcohol and Tobacco Control**
**Murphy J. Painter, COATC**

**David Alexander Young**
**Asst. Attorney General**
**1885 North 3rd Street, 6th Floor**
**Baton Rouge, LA 70802**
**(225) 326-6030**
**Counsel for Defendants/Appellees:**
**State of Louisiana, Office of Alcohol and Tobacco Control**
**Murphy J. Painter, COATC**

**Christian T. Avery**
**Attorney at Law**
**208 E. Cornerview Street**
**Gonzales, LA 70737**
**(225) 647-2155**
**Counsel for Defendants/Appellees:**
**State of Louisiana, Office of Alcohol and Tobacco Control**
**Murphy J. Painter, COATC**

**Charles E. Smarr**
**Brydon, Swearengen & England**
**312 East Capitol Avenue**
**Jefferson City, MO 65101**
**(573) 635-7166**
**Counsel for Defendants/Appellees:**
**State of Louisiana, Office of Alcohol and Tobacco Control**
**Murphy J. Painter, COATC**

**EZELL, JUDGE.**

In this matter, Wendell Manuel, d/b/a Jungle Lounge and Restaurant, and B&S Corner Grocery Store, Inc. (herein after collectively referred to as "the Plaintiffs"), appeal the decision of the trial court dismissing their claim that bans on certain practices relating to the wholesale and retail of alcoholic beverages within the State of Louisiana are unconstitutional violations of the Sherman Act and the Interstate Commerce Clause of the United States Constitution. For the following reasons, we affirm the decision of the trial court.

The Plaintiffs are retailers of alcoholic beverages. In the trial court below, they challenged the three-tier system controlling the distribution of alcohol in Louisiana, alleging that "certain practices" set forth under Louisiana law are unconstitutional. These practices include: 1) a ban on certain credit sales by a wholesaler to a retailer; 2) a ban on price discounts based upon volume; 3) a "delivered-pricing requirement;" 4) a ban on central warehousing by retailers of alcoholic beverages; 5) a ban on the provision of distribution services by retailers; 6) a ban on sales or deliveries by a wholesaler to retailers located outside of the wholesaler's territory; 7) the ban on direct shipping to consumers by retailers domiciled inside Louisiana, and 8) the ban on direct shipping to consumers in prohibition territory by retailers domiciled within the state of Louisiana.

The trial court, noting that, if successful, the Plaintiffs' claims would result in the functional collapse of the retail and wholesale tiers of Louisiana's three-tiered alcoholic beverage distribution system, ruled that the bans were not unconstitutional and dismissed the Plaintiffs' claims. From this decision, the Plaintiffs appeal.

The Plaintiffs assert one assignment of error on appeal, that the trial court erred in failing to declare the "challenged practices" unconstitutional. We find this claim to be devoid of merit.

1

In the case sub judice, the trial court set forth extensive and well-reasoned written reasons for its judgment into the record, setting out the law and the facts in great detail. A thorough review of the record and relevant jurisprudence finds them to be both persuasive and correct. Accordingly, we adopt the trial court's reasons for judgment as our own and attach them as an appendix hereto.

Based on the foregoing, the decision of the trial court is hereby affirmed. All costs of this appeal are assessed against Wendell Manuel, d/b/a Jungle Lounge and Restaurant, and B&S Corner Grocery Store, Inc.

**AFFIRMED.**

WENDELL J. MANUEL                    :        13th JUDICIAL DISTRICT COURT
d/b/a/ JUNGLE LOUNGE &               :
RESTAURANT, et al.                   : 2001 OCT 29  A 8: 55   DOCKET NO.: 68791-A
                                     :
v.                                   :
                                     : WALTER LEE. CLERK
                                     : EVANGELINE PARI PARISH OF EVANGELINE
STATE OF LOUISIANA, OFFICE OF        :
ALCOHOL AND TOBACCO CONTROL,         :            STATE OF LOUISIANA
et al.                               :

## JUDGMENT AND INCORPORATED REASONS FOR JUDGMENT

This matter came before the Court for hearing on August 24, 2007. The case was submitted on the briefs of the parties, the record, affidavits, stipulations, exhibits, and arguments of counsel.

Plaintiffs are two duly licensed retailers of alcoholic beverages in the State of Louisiana. Plaintiff Wendell J. Manuel is a resident of and domiciled in Evangeline Parish. Plaintiff B&S Corner Grocery Store, Inc. is a domestic corporation domiciled in and with its principal place of business likewise in Evangeline Parish. By consent judgment, some of the original defendants were dismissed and others added, and the action proceeded against the State of Louisiana through the Office of Alcohol and Tobacco Control, and Murphy J. Painter, Commissioner of the Office of Alcohol and Tobacco Control.

The record establishes that a combination of State statutory provisions, regulations, administrative practices, and administrative interpretations serves to impose eight legal requirements in regulation of alcoholic beverages:

- 1) a ban on certain credit sales by a wholesaler to a retailer,
- 2) a ban on price discounts based upon volume in sales by a wholesaler to a retailer,
- 3) a so-called delivered-pricing requirement in sales by a wholesaler to a retailer, *e.g.,* a ban on giving a retailer a credit to reflect provision by the retailer of what would normally be a wholesaler service such as transport or warehousing,
- 4) a ban on central warehousing by retailers,
- 5) a ban on the provision of distribution services by retailers,
- 6) a ban on sales or delivery by a wholesaler to retailers located outside the wholesaler's territory,
- 7) a ban on direct shipping to consumers by retailers domiciled inside Louisiana, and
- 8) a ban on direct shipping to consumers in prohibition territory by retailers domiciled inside Louisiana.

Plaintiffs challenge the first six of these bans as violating the Sherman Act, 15 U.S.C. § 1, and the final two bans as violating the Interstate Commerce Clause of the United States Constitution. (Remaining grounds for challenging these eight bans were not argued or briefed by Plaintiffs and are deemed to be waived.)

This order will first address the challenge, based upon the Sherman Act, to the first six bans and then will conclude with a discussion of the challenge, based upon the Commerce Clause, to the final two bans.

## INTRODUCTION

Defendants provide exhaustive explanations, or justifications, for the six so-called regulatory bans challenged under the Sherman Act, but a justification common to them all is that they promote the separation, independence, and stability of the three tiers and are, in fact, integral components of Louisiana's three-tier system for the regulation of alcoholic beverages within the State. A central argument here is that, if Plaintiffs prevail, there will be a functional collapse of the wholesale and retail tiers. To see Defendants' argument, consider just two of the bans at issue: 1) the ban on volume discounts and 2) the ban on central warehousing by retailers.

1

169

Volume discounts are bulk purchases, by a retailer, at steep discounts as compared to the usual price to the retailer. From the Defendants' regulator's perspective, this just amounts to replacing the wholesaler on a functional basis with the retailer. Just like a wholesaler, the retailer would make bulk purchases and would get in return a price approaching what a wholesaler would get for similar bulk purchases.

Central warehousing by a retailer is warehousing at a central location, to service several retail locations, with deliveries made by transport provided by the retailer to each retail location as needed. From the Defendants' regulator's perspective, this just amounts, yet again, to replacing the wholesaler on a functional basis with the retailer. Just like a wholesaler, the retailer would maintain a central warehouse that would service multiple retail locations, and the warehouseperson/retailer would transport product from the central warehouse to each retail location as needed.

If a retailer were allowed to combine volume discounts and central warehousing, the retailer could purchase even greater volumes (to be stored in the central warehouse supplying multiple retail locations) and secure even steeper discounts. Again, the retailer would functionally replace the wholesaler even more so. Such a retailer would be vertically integrating from the lowest tier up to the middle tier – in effect, functionally collapsing the two tiers. Such a development would render the wholesale tier increasingly irrelevant. Not only would the separation, independence, and stability of the wholesale tier be threatened, but the very structure of the three-tier system.

Yet, the United States Supreme Court has written:

> The Twenty-first Amendment grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system. A State which chooses to ban the sale and consumption of alcohol altogether could bar its importation; and, as our history shows, it would have to do so to make its laws effective. **States may also assume direct control of** liquor distribution through state-run outlets or **funnel sales through the three-tier system. We have previously recognized that the three-tier system itself is unquestionably legitimate.**

*Granholm v. Heald*, 544 U.S. 460, 488-89, 125 S. Ct. 1885, 1905 (2005) (citation & internal quotation marks omitted). Further, to paraphrase the Fourth Circuit, an argument that would result in a functional collapse of the wholesale tier into the retail tier "is nothing different than an argument challenging the three-tier system itself," and such an "argument is foreclosed by the Twenty-first Amendment and the Supreme Court's decision in *Granholm*, which upheld the three-tier system as unquestionably legitimate." *Brooks v. Vassar*, 462 F.3d 341, 352 (4th Cir. 2006) (internal quotation marks omitted). A challenge to the three-tier system is "foreclosed" with such finality because of the nature and force of the 21st Amendment and the changes its adoption wrought upon the legal structure for regulating alcoholic beverages.

## DISCUSSION

### I.

"The Twenty-first Amendment made a fundamental change, as to control of the liquor traffic, in the constitutional relations between the States and national authority." *United States v. Frankfort Distilleries, Inc.*, 324 U.S. 293, 300, 65 S. Ct. 661, 665 (1945) (Frankfurter, J., concurring). For instance, when the 18th Amendment prohibited commerce in alcoholic beverages, it gave "Congress and the several States . . . *concurrent power* to enforce this article by appropriate legislation." U.S. CONST. amend. XVIII, § 2 (emphasis supplied). With repeal of the 18th Amendment, the 21st Amendment by contrast scrapped the "concurrent power" formula and gave authority over the "transportation or importation into any State . . . for delivery or use therein of intoxicating liquors" to "the laws *thereof*." U.S. CONST. amend. XXI, § 2 (emphasis supplied). The 21st Amendment expanded the power of each of the several States to regulate alcoholic beverages within the State. With this expansion of State power, there was a corresponding limitation of Congress's Commerce Clause power to regulate alcoholic beverages and especially a limitation of Congress's power to regulate alcoholic beverages in contravention of State law. *See California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97,

2

Date:10/31/2007

108, 100 S. Ct. 937, 945 (1980) (Congress's interstate commerce power to regulate alcoholic beverages "is directly qualified by § 2"); *see also 324 Liquor Corp.* v. *Duffy*, 479 U.S. 335, 346, 107 S. Ct. 720, 727 (1987) ("§ 2 directly qualifies the federal commerce power").

Relying upon the ratification history of the 21st Amendment, Defendants make the case that the expanded power of each of the several States to regulate alcoholic beverages within the State specifically includes, and was intended by the framers and ratifiers of the Amendment to include, the power to regulate or control prices for alcoholic beverages within the State.

With Prohibition, there was no legal commerce in alcoholic beverages and no regulation, Federal or State, of such commerce beyond outright prohibition. Thus, at the time repeal of Prohibition was being contemplated, the regulatory slate had in effect been wiped clean. In this vacuum, before the 21st Amendment was ratified and while it was under consideration, John D. Rockefeller commissioned a research study to be conducted by Raymond B. Fosdick and Albert L. Scott. The result of their study was a book entitled *Toward Liquor Control*, published in early 1933: R.B. FOSDICK & A.L. SCOTT, TOWARD LIQUOR CONTROL (Harper & Bros. Publishers 1st ed. 1933). *See* Painter Aff. ¶¶ 2-22. It was against the background of this seminal study that the 21st Amendment was considered for ratification. Nearly a year later, in late 1933, the Secretary of State proclaimed the 21st Amendment to have been ratified by 36 of the 48 States. Both during ratification and thereafter, the study became a virtual roadmap for the several States and their regulators showing them the various ways in which alcoholic beverages could once again be regulated upon repeal of Prohibition.

Of critical importance to the study's authors was the goal of "the elimination of the profit motive," *e.g.*, R.B. FOSDICK & A.L. SCOTT at 57, from the distribution and sale thereafter of alcoholic beverages. At every juncture throughout the study, when considering every facet of the industry and the myriad alternative administrative practices that could be adopted upon repeal of Prohibition, the study endeavors to eliminate the drive for profits. So salient was this consideration that the study recommended to the several States that they each create a so-called State Authority that would maintain a kind of monopoly over the distribution and sale of alcoholic beverages. Indeed, many States did follow this recommendation and do so to this day.

The study's authors also knew, however, that many States would adopt a licensing system, and therefore, the study also discussed "the soundest possible licensing system, if such a system must be adopted." R.B. FOSDICK & A.L. SCOTT at 41. In outlining such a licensing system, the study also recommended various ways in which the profit motive could be eliminated or at least curtailed. In addition to other recommendations, the study stated that "an effort may be made under the licensing system to control prices and profits," for instance, by extending "the price control provision" to the wholesale tier or by establishing, for instance, "minimum and maximum prices for the sale of liquor." R.B. FOSDICK & A.L. SCOTT at 52. In the authors' eyes, a licensing system was inferior to a State Authority because such a system retained "private profit motive." R.B. FOSDICK & A.L. SCOTT at 56. Nonetheless, by implementing certain restrictions, according to the study, even a licensing system "could be contrived, as we have suggested above, by which **prices are fixed** and profits are limited." *E.g.*, R.B. FOSDICK & A.L. SCOTT at 57 (emphasis supplied).

In the *Frankfort Distilleries* case, which also involved application of the Sherman Act in a post-21st Amendment environment, the question was not directly posed because "The Sherman Act [was] not being enforced in this case in such manner as to conflict with the law of Colorado."[1] By contrast, the instant case does present the question: Paraphrasing *Frankfort Distilleries*, Plaintiffs here would have "the Sherman Act . . . applied to defeat the policy of the state." Here, assuming Plaintiffs' Sherman Act claims are viable, Louisiana, unlike Colorado, does have a number of policies concerning the regulation of alcoholic beverages apparently at variance with the Sherman Act.[2]

---

[1] 324 U.S. at 299, 65 S. Ct. at 664; *see also id.* 324 U.S. at 299-300, 65 S. Ct. at 664-65 ("We therefore do not have here a case in which the Sherman Act is applied to defeat the policy of the state. That would raise questions of moment which need not be decided until they are presented"); 324 U.S. at 301-02, 65 S. Ct. at 666 (Frankfurter, J., concurring).

[2] The Court notes in this connection that House Concurrent Resolution No.191 from the 2007 Regular Session was entered into the record, recognizing, among other things, Louisiana's "substantial interest in exercising its powers and the powers delegated to the state by the Twenty-First Amendment to the Constitution of the United States and in

3

171

For a case properly presenting the question, as here, Justice Frankfurter provided an analytic framework for working out a seeming conflict between State 21st Amendment power and policy, on one hand, and Federal Commerce Clause power and policy, on the other, when it comes to the regulation of alcoholic beverages. The framework "depends upon the utilization by a State of its constitutional power under the Twenty-first Amendment." *Id.*[3]

*First,* "if a State chooses not to exercise the power given it by the Twenty-first Amendment and to continue to treat intoxicating liquors like other articles, the operation of the Commerce Clause continues." 324 U.S. at 300, 65 S. Ct. at 665 (Frankfurter, J., concurring). This would apply to the operation of both judge-made dormant Commerce Clause jurisprudence and, as Justice Frankfurter made clear, Federal legislation passed pursuant to the Commerce Clause power.

*Second,* on the other hand, if a State does exercise its 21st Amendment power and does so in a way that is not consistent with Federal Commerce Clause power and policy, the latter must "yield." 324 U.S. at 301, 65 S. Ct. at 665 (Frankfurter, J., concurring). Again, this would apply to the operation of both judge-made dormant Commerce Clause jurisprudence and, as Justice Frankfurter made clear, Federal legislation passed pursuant to the Commerce Clause power. Specifically, this principle would apply to the Sherman Act, at issue in the present case as well:

> Since the Commerce Clause is subordinate to the exercise of state power under the Twenty-first Amendment, the Sherman Law, deriving its authority from the Commerce Clause, can have no greater potency than the Commerce Clause itself. It must equally yield to state power drawn from the Twenty-first Amendment.

324 U.S. at 300-01, 65 S. Ct. at 665 (Frankfurter, J., concurring).

As Justice Frankfurter wrote,

> If a State for its own sufficient reasons deems it a desirable policy to standardize the price of liquor within its borders either by a direct price-fixing statute or by permissive sanction of such price-fixing in order to discourage the temptations of cheap liquor due to cutthroat competition, the Twenty-first Amendment gives it that power and the Commerce Clause does not gainsay it.

324 U.S. at 301, 65 S. Ct. at 665 (Frankfurter, J., concurring).[4] This analysis is entirely confirmed, as discussed above, by the ratification history of the 21st Amendment.

In the present case, six of Plaintiffs' challenges assert violation of the Sherman Act. All six so-called bans result from Louisiana practices and provisions reflecting the State's policy for regulating alcoholic beverages, including measures designed to regulate prices. Within State law, all these practices and provisions properly derive from the police power, among others. Vis-à-vis the Federal Government, all these practices and provisions properly derive from the State's 21st Amendment power. To the extent there is a conflict between these Louisiana practices and provisions in governance of alcoholic beverages, deriving their authority vis-à-vis the Federal Government from the 21st Amendment, and the Sherman Act, deriving its authority from the Commerce Clause, the latter must "yield." 324 U.S. at 300-01, 65 S. Ct. at 665 (Frankfurter, J., concurring).[5] Even if the Sherman Act, enacted in 1890, was once understood to override such

---

regulating the structure of the state's alcoholic beverage industry, including the activities of manufacturers, importers, wholesalers, retailers, and e-commerce merchants, the method by which alcoholic beverages are marketed, and influences that affect consumption levels of beverage alcohol by the people of the state."

[3] A similar analysis is found in the concurring opinion in *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S. Ct. 863 (1952), wherein Justice Jackson proposed three categories by which to assess an assertion of power by one arm of government in tension with the power of another arm of government.

[4] *See also* 324 U.S. at 301, 65 S. Ct. at 665 (Frankfurter, J., concurring) ("if a State authorized the transactions here complained of, the Sherman Law could not override such exercise of state power").

[5] Indeed, if the Sherman Act is not understood to "yield," the continued application of the Act under the circumstances of this case would result in a violation of the United States Constitution. If, because of the application of the Sherman Act, "intoxicating liquors" would be transported or imported into Louisiana "for delivery or use

4

Date:10/31/2007

State measures with respect to alcoholic beverages, the Commerce Clause basis for the Sherman Act has since been narrowed, or "qualified,"[6] by the 21st Amendment. Accordingly, the Sherman Act should no longer be understood or applied in this manner.

## II.

Short of assessing the relative power of the State and the Federal Government to adopt competing policies to govern the regulation of alcoholic beverages in Louisiana, this case also presents the question whether there is a conflict in the policies each has adopted. Defendants contend that Louisiana policy and Federal policy actually run parallel.

It was in 1913 that Congress first passed the Webb-Kenyon Act, then entitled "An Act Divesting intoxicating liquors of their interstate character in certain cases" (and which later became a model for the 21st Amendment), but it was quickly overtaken by Prohibition through the adoption of the 18th Amendment. After the repeal of Prohibition through the 21st Amendment, Congress again, this time in 1935, passed the Webb-Kenyon Act. In effect, the Webb-Kenyon Act codifies, or implements, the 21st Amendment at the Federal level.

In matters relating to the regulation of alcoholic beverages, the Webb-Kenyon Act, first enacted in 1913 and re-enacted in 1935, has implications for the interpretation of the Sherman Act of 1890 as applied to commerce in alcoholic beverages. The Webb-Kenyon Act provides:

### § 122. Shipments into States for possession or sale in violation of State law

The shipment or transportation, in any manner or by any means whatsoever, of any spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind from one State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, into any other State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, or from any foreign country into any State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, *which said spirituous, vinous, malted, fermented, or other intoxicating liquor is intended, by any person interested therein, to be received, possessed, sold, or in any manner used*, either in the original package or otherwise, *in violation of any law of such State*, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, *is prohibited.*

27 U.S.C. § 122 (emphasis supplied).

If, because of the application of the Sherman Act, "intoxicating liquor" would be shipped or transported into Louisiana with the intention "to be received, possessed, sold, or in any manner used" "in violation of any law of" Louisiana (*e.g.*, the six bans challenged here), a violation of the Webb-Kenyon Act would result.

The Webb-Kenyon Act applies specifically to the selling, among other things, of alcoholic beverages. The Sherman Act, of course, applies far more generally to commerce. The Sherman Act was enacted in 1890. The Webb-Kenyon Act was later enacted, once in 1913 and, a second time, in 1935. The twice later-enacted Webb-Kenyon Act, pertaining specifically to the regulation of alcoholic beverages, should be understood as a pro tanto amendment of the earlier-enacted and more general Sherman Act – and therewith an amendment of Federal policy as well with respect to the regulation of alcoholic beverages.[7]

---

therein" "in violation" of her laws (*i.e.*, the six bans challenged here), U.S. CONST. amend. XXI, § 2, a 21st Amendment violation would result. Of course, this Court may not issue Plaintiffs' requested declaratory and injunctive relief if it would result in unconstitutional transportation and importation into Louisiana.

[6] *Duffy*, 479 U.S. at 346, 107 S. Ct. at 727; *Midcal Aluminum, Inc.*, 445 U.S. at 108, 100 S. Ct. at 945.

[7] In other ways as well, Congress has evinced an intention to leave the States alone in this regard and, further, to respect their regulatory authority in this area. When establishing its own regulation of alcoholic beverages in 1935, Congress provided an exemption for the States: "The provisions of subsections (a), (b), and (c) of this section shall not apply to any act done by an agency of a State or political subdivision thereof, or by any officer or employee of such agency." 27 U.S.C. § 205. Similarly, in the case of malt beverages, the Federal provisions would apply only if a State had adopted parallel provisions. *E.g.*, 27 U.S.C. § 205 ("In the case of malt beverages, the provisions of

5

Date:10/31/2007

That Louisiana policy and Federal policy run parallel can also be demonstrated in other ways. For instance, in the case of five of the so-called bans, the Federal Government has adopted, in the Federal Alcohol Administration Act of 1935, a similar and even closely parallel provision for its own regulation of alcoholic beverages. *See* Painter Aff. ¶¶ 31, 34, 39B, 44D, 50D. This has important implications for this case. First, although Louisiana has chosen "to exercise the power given it by the Twenty-first Amendment," 324 U.S. at 300, 65 S. Ct. at 665 (Frankfurter, J., concurring), a true conflict of policies is not presented. Indeed, the Louisiana practices and provisions challenged here were most probably modeled after the example set by the Federal Government with the enactment of the Federal Alcohol Administration Act. *See* Painter Aff. ¶ 31. Second, to the extent the Federal Government's provisions could be understood as conflicting with the Sherman Act (just as Louisiana's parallel provisions are asserted to conflict with the Sherman Act), the later-enacted Federal provisions, pertaining specifically to the regulation of alcoholic beverages, should be understood as a pro tanto amendment of the earlier-enacted and more general Sherman Act -- and therewith, again, an amendment of Federal policy as well with respect to the regulation of alcoholic beverages. To the extent there is such a carve-out from the Sherman Act policy to accommodate the Federal provisions in the Federal Alcohol Administration Act, that carve-out should be understood to apply to Louisiana's parallel provisions as well.[8]

## III.

The foregoing analysis addresses competing State (under the 21st Amendment) and Federal (under the Commerce Clause) claims of power to regulate alcoholic beverages and, further, whether these powers have been exercised to adopt policies that are in fact in competition with one another. Some cases have not reached these questions because the State's 21st Amendment interest was not considered to be substantiated. Whether a State's 21st Amendment interest should be regarded as substantiated presents as a preliminary matter who bears the burden, and what burden, on this question.

## A.

In the recent case of *Costco Wholesale Corp. v. Hoen*, Case No. C04-360P (W.D. Wash.) (presently on appeal), the court discussed the 21st Amendment in these terms: "As an affirmative defense, Defendants argue that the challenged restraints may be preserved as valid exercises of state power under the Twenty-first Amendment to the Constitution. Because this is an affirmative defense, the Court concludes that Defendants bear the burden of demonstrating that the challenged restraints are shielded by the Twenty-first Amendment." *Costco Wholesale Corp. v. Hoen*, Case No. C04-360P, Slip op., 2006 WL 1075218, at *9, 2006-1 Trade Cases para. 75,250 (W.D. Wash. Apr. 21, 2006) (citing *Bainbridge v. Turner*, 311 F.3d 1104, 1115 n.16 (11th Cir. 2002)), *corrected as to certain findings of fact and conclusions of law*, 2006 WL 1303107 (May 9, 2006), *staying judgment*, 2006 WL 1515590 (May 25, 2006), *extending stay*,

---

subsections (a), (b), (c), and (d) of this section shall apply to transactions between a retailer or trade buyer in any State and a brewer, importer, or wholesaler of malt beverages outside such State only to the extent that the law of such State imposes similar requirements with respect to similar transactions between a retailer or trade buyer in such State and a brewer, importer, or wholesaler of malt beverages in such State, as the case may be").

More recent Congressional enactments have continued to show respect for the States' authority in this area. *See generally* 27 U.S.C. §§ 122a & 122b (21st Amendment Enforcement Act left intact States' authority over alcoholic beverage distribution within their boundaries while providing them injunctive remedy against violators); 42 U.S.C. § 290bb-25b(b)(7)("Alcohol is a unique product and should be regulated differently than other products by the States and Federal Government. States have primary authority to regulate alcohol distribution and sale, and the Federal Government should support and supplement these State efforts. States also have a responsibility to fight youth access to alcohol and reduce underage drinking. Continued State regulation and licensing of the manufacture, importation, sale, distribution, transportation and storage of alcoholic beverages are clearly in the public interest and are critical to promoting responsible consumption, preventing illegal access to alcohol by persons under 21 years of age from commercial and non-commercial sources, maintaining industry integrity and an orderly marketplace, and furthering effective State tax collection").

[8] In the *Frankfort Distilleries* case, Justice Frankfurter suggested yet another way to reconcile the Sherman Act with post-21st Amendment State regulation of alcoholic beverages. Noting that the Sherman Act has long been interpreted as prohibiting unreasonable restraints of trade, he suggested that conduct in conformity with State policy on alcoholic beverages "could not be deemed an 'unreasonable' restraint of interstate commerce." *Frankfort Distilleries*, 324 U.S. at 302, 65 S. Ct. at 665 (Frankfurter, J., concurring).

6

174

Date:10/31/2007

2006 WL 2645183 (Sept. 14, 2006) (on appeal). In the *Bainbridge* case itself, however, the court broke down this inquiry into two parts. First, it determined that the "State's reliance on the Twenty-first Amendment constitutes an affirmative defense within the meaning of Rule 8(c) of the Federal Rules of Civil Procedure, in that from a *procedural* point of view, the State is treated as seeking to 'avoid' the Commerce Clause violation. Rule 8(c) provides in pertinent part: 'In pleading to a preceding pleading [here, the [*Bainbridge*] appellants' complaint] a party [here, the State [in *Bainbridge*]] shall set forth . . . any . . . matter constituting an avoidance or affirmative defense.'" *Bainbridge*, 311 F.3d at 1111 n.13 (emphasis supplied, alteration in part in *Bainbridge* original). Second, having determined that the procedural burden to raise the defense lay with the State, the *Bainbridge* court then went on (in the footnote cited by the *Costco* court, and elsewhere) to determine what the appropriate substantive burden was.

Applying not the *Costco* model, but rather the *Bainbridge* model (upon which *Costco* purported to rely), Defendants here have already amply met any procedural burden to raise the 21st Amendment.

B.

In the present case, with respect to the challenges to the first six so-called bans, there is no question of any discrimination against out-of-state economic interests and against interstate commerce. Accordingly, the question by what test to substantiate the State's 21st Amendment interest against a so-called first-tier Commerce Clause claim is not presented.[9] In the absence of any discrimination, this case at most presents a so-called second-tier Commerce Clause claim: "'When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.'" *Bainbridge*, 311 F.3d at 1109 (quoting *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579, 106 S. Ct. 2080, 2084 (1986) (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 847 (1970)). Accordingly, the question presented by this case is by what test to substantiate the State's 21st Amendment interest where the challenged State measure has at most "only indirect effects on interstate commerce and regulates evenhandedly."

The test here, in the absence of any 21st Amendment interest, is "whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." In the presence of a 21st Amendment interest, the test should shift to even greater deference to State measures, but there is apparently no established case law for this case. There is, however, a closely parallel case, likewise weighing State 21st Amendment interests against Federal interests, in *North Dakota v. United States*, 495 U.S. 423, 110 S. Ct. 1986 (1990). That case involved, on the Federal side, not the Commerce Clause, but rather the intergovernmental immunity doctrine. Nonetheless, similar to the *Pike* test, the Court examined whether the effects of the State measure were direct or indirect and the burden substantial or insubstantial. 495 U.S. at 435-44, 110 S. Ct. at 1994-99. In this context, the presence of 21st Amendment interests – at least when they represented core concerns – lent the challenged State measure "a strong presumption of validity." 495 U.S. at 432, 110 S. Ct. at 1994 (plurality opinion). In the absence of established case law specifically tailored to the Commerce Clause, this Court will apply the *North Dakota* test by analogy.

In *North Dakota*, 21st Amendment core concerns were accepted as implicated because of the presence of a "risk" based upon an administrator's description of the "types of misconduct that North Dakota liquor regulations are intended to prevent." 495 U.S. at 433 & n.5, 110 S. Ct. at 1993 & n.5. Similarly, in the present case, Defendants have submitted the affidavit of Murphy J. Painter, Commissioner of Louisiana Office of Alcohol and Tobacco Control, who provides an exhaustive explanation of the regulatory considerations supporting the Louisiana practices and

---

[9] For the particular combination of a first-tier Commerce Clause claim and a core-concern 21st Amendment interest, the *Bainbridge* court proposed the following: "When such a concern is implicated, the Amendment removes the constitutional cloud from the challenged law so long as the state demonstrates that it genuinely needs the law to effectuate its proffered core concern." *Bainbridge*, 311 F.3d at 1112; *see also id.* at 1114 & n.17 ("This does not mean, however, that the State can prevail without evidence supporting a genuine need for its discriminatory laws. Not only must the State raise a 'core concern,' but it must also show that its statutory scheme is genuinely needed to effectuate the proffered core concern"; "This evidentiary standard is far less than the strict scrutiny required under a traditional tier-one analysis of discriminatory laws. For example, the State need not show that there are no nondiscriminatory alternatives available" (tendential quotation marks in the *Bainbridge* original, footnote omitted)).

7

provisions challenged by Plaintiffs.

All six of the bans challenged under the Sherman Act are asserted to be "an integral part of Louisiana's three-tier system":

24.

. . . The three-tier system mandates separation of the alcoholic beverage industry into three tiers: a supplier tier, a wholesaler tier, and a retailer tier. The segmentation of the industry into three tiers serves multiple purposes . . . .

25.

Without the three-tier system, the natural tendency historically has been for the supplier tier to integrate vertically. With vertical integration, a supplier takes control of the manufacture, distribution, and retailing of alcoholic beverages, from top to bottom. The result is that individual retail establishments become tied to a particular supplier. When so tied, the retailer takes its orders from the supplier who controls it, including naturally the supplier's mandate to maximize sales. A further consequence is a suppression of competition as the retailer favors the particular brands of the supplier to which the retailer is tied – to the exclusion of other suppliers' brands. With vertical integration, there are also practical implications for the power of regulators. A vertically integrated enterprise – comprising manufacture, distribution, and retailing – is inevitably a powerful entity managed and controlled from afar by non-residents.

26.

The three-tier system was implemented to counteract all these tendencies. Under the three-tier system, the industry is divided into three tiers, each with its own service focus. No one tier controls another. Further, individual firms do not grow so powerful in practice that they can out-muscle regulators. In addition, because of the very nature of their operations, firms in the wholesaling tier and the retailing tier have a local presence, which makes them more amenable to regulation and naturally keeps them accountable. Further, by separating the tiers, competition, a diversity of products, and availability of products are enhanced as the economic incentives are removed that encourage wholesalers and retailers to favor the products of a particular supplier (to which wholesaler or retailer might be tied) to the exclusion of products from other suppliers.

Painter Aff. ¶¶ 24-26.

Several of the challenged bans are parts of the system of prohibiting inducements, discussed here in terms of the ban on credit sales:

27.

Part of the three-tier system is the prohibition of inducements. Suppliers and wholesalers are forbidden to offer inducements to retailers, including the inducement of sales on credit. Likewise, retailers are forbidden to accept inducements, including purchases on credit. . . .

28.

Without the prohibition of inducements, including the inducement of credit sales, there is a tendency for the three-tier system to break down and a tendency for the evils of vertical integration to arise again.

29.

To take one example from regulators' experience: If credit sales are allowed, there is no way for the regulator to know in any particular instance whether a credit sale was extended to a retailer because of the creditworthiness of the retailer or whether the credit was extended to the retailer with an unwritten side agreement according to which the retailer will favor the seller's products over other products.

30.

Even if credit sales were allowed generally and prohibited only in those individual cases where there was a demonstrated quid pro quo, there would be manifest problems of proof for the regulator, given the possibility of unwritten verbal agreements or even unspoken understandings. Furthermore, there would be the administrative expense and burden on regulators to put together a host of

8

Date:10/31/2007

investigators just to unearth verbal or unspoken understandings if the simple per se prohibition of inducements were declared illegal.

*Id.* ¶¶ 27-30. Similar explanations are made with respect to many of the other bans at issue. *Id.* ¶¶ 34, 39, 44, 44A, 44B, 44C, 44D, 50, 50A, 50B, 50C, 50D. Significantly, the Commissioner notes that the Federal Government uses a similar regulatory device, prohibition of inducements, in its own regulation of the alcoholic beverage industry. *Id.* ¶¶ 31, 34, 39B, 44D, 50D.

Notwithstanding that Plaintiffs' challenge here is based on the Sherman Act, several of the bans are candidly further explained as devices to influence prices.[10] Several regulatory considerations are offered in support of these devices. They are explained as devices to avoid price differentials within the State. Price differentials across geographic areas would create incentives and conditions inviting the establishment of a bootleg system of the distribution within the State. *E.g., id.* ¶¶ 35, 35A, 36, 36A, 36B, 36C, 36D, 36E, 36F, 36G. Further, there is a risk of diversion if such price differentials are not tamped down. *E.g., id.* ¶¶ 36, 36H, 36I, 36J. Once a risk of diversion arises, other goals, such as the temperance goal of preventing underage access to alcoholic beverages,[11] are likewise put at risk. *E.g., id.* ¶ 36I. Further, if bootleg distribution – say, by retailers to other retailers – is allowed to arise, there is a direct concomitant breakdown of the three-tier system itself. *E.g., id.* ¶ 36D, 36K.

Three of the bans,[12] in addition to being supported by the regulatory considerations discussed above, are in reality part of the very structure of the three-tier system. A challenge to these is asserted to be, in essence, "a direct assault on the three-tier system," discussed here in terms of the delivered-pricing requirement:

40.
[W]hen a retailer takes on distribution functions and receives price credits in return, the wholesaler simultaneously surrenders that same distribution function. The result is a direct assault on the three-tier system.

40A. Those who advocate for dismantling the delivered-pricing requirement are in reality launching a direct attack on the three-tier system. The entire premise of the three-tier system is and was to separate the alcoholic beverage industry into distinct tiers, each of which would concentrate on a different focus of services. Obviously, if wholesalers – the tier focused upon distribution services – stop providing a distribution service, and retailers start providing that same service and, further, are compensated therefor through a credit, there is an immediate breakdown of the entire three-tier system and an undermining of all the purposes that system was designed to serve.

*Id.* ¶¶ 40, 40A; *see also id.* ¶¶ 45, 45A, 51, 51A.

The final ban challenged here – the ban on sales or delivery by a wholesaler to retailers located outside the wholesaler's territory – is described as "a part of Louisiana's three-tier system designed to moderate competition and, in turn, promote the stability especially of the wholesaler tier." *Id.* ¶ 55. State regulators rely especially upon the wholesale tier to exercise their regulatory and oversight function, in effect deputizing the wholesale tier to ensure compliance with regulatory requirements, especially by the retail tier. *Id.* ¶¶ 56, 57. In addition, the wholesale tier

---

[10] *E.g.*, Painter Aff. ¶ 35 ("Second, the ban on volume discounts is a moderate indirect device by which to control prices. Volume discounts by their very nature encourage retailers to buy ever larger quantities. Large quantities of alcoholic beverages in turn encourage increased sales. Economic pressures on the retailer to unload large quantities of product, in turn, encourage reduced prices to the consumer. Further, if competing retailers find themselves each with large quantities of product to unload on the market, there is great potential for price wars to break out"); *see also id.* ¶¶ 35A, 36, 36A, 36B, 36E, 36G, 41, 59, 60, 66, 68, 69, 70, 70A, 70B, 70C, 70D, 70E, 70F, 70G & 78.

[11] In the particular case of volume discounts, there is an additional threat to the temperance goal of moderate consumption as "volume discounts by their very nature invite purchase by the retailer of ever greater quantities. In order to remain solvent, the retailer must unload these quantities on the market, leading to ever increasing sales volume. In order to accomplish this, in practice, the retailer must offer deep price cuts to the consumer. Indeed, the price cut the retailer received from its seller makes it possible for the retailer, in turn, to offer price cuts to the consumer." Painter Aff. ¶ 36.

[12] The delivered-pricing requirement, the ban on central warehousing by retailers, and the ban on the provision of distribution services generally by retailers.

177

Date:10/31/2007

is treated much like a regulated monopoly. Within its territory, each wholesaler is required to serve all parts of its territory without regard to profitability. *Id.* ¶ 66. Because of these extraordinary obligations placed upon the wholesale tier, Louisiana has adopted a policy of ensuring the stability of the wholesale tier, by making sure that wholesalers operate in a moderately competitive environment without the pressures of intense competition and without the risk of business failure that would result if there were unbridled competition. *E.g., id.* ¶¶ 58, 59, 60. In addition, this final ban is part of the so-called franchise system, which protects the wholesaler from arbitrary termination by suppliers and thereby promotes both the stability and especially the independence of the wholesaler tier vis-à-vis the supplier tier, as well as promoting fairness as between wholesaler and supplier. *Id.* ¶¶ 61-65. Moreover, the critically important point is made that, to the extent obligations are imposed upon the wholesaler akin to those imposed upon a regulated monopoly to serve all parts of a territory without regard to profitability, there must be a compensating mechanism, a mechanism to compensate for expensive service to rural areas at prices often below cost. The compensating mechanism is an exclusive territory that allows service to the populous urban areas at prices potentially above the actual cost of service to such areas – prices that would not survive if there were unbridled competition. *E.g., id.* ¶¶ 66, 67, 70D.

Each of the bans challenged here, as a component of a larger system, by supporting the integrity of that system simultaneously plays a role in promoting the purposes the system as a whole is designed to promote. For instance, central to the three-tier system is a comprehensive system of controlled and continuously tracked and recorded transportation, distribution, storage, and sale (or furnishing). All of these regulatory steps are taken, among other reasons, to avoid the risk of diversion of product out of the system. If product is diverted out of system, then other goals are never attained. It is only by keeping every unit of product in the regulated and controlled system from start to finish – in other words reducing the risk of diversion to a minimum – that other goals may be attained. If, for instance,. there is any diversion out of the system along the way (at the supplier's level, at the time of transportation from supplier to wholesaler, at the wholesaler's level, at the time of distribution from wholesaler to the retailer, *etc.*), then the conditions under which such diverted product will be sold or furnished are completely out of control of the regulator. With that loss of control, the temperance goal of reducing or eliminating sales (or furnishing) to underage persons is put at risk. With that loss of control, the goal of reducing or eliminating tax evasion or inefficient and ineffective taxation is likewise put at risk. Again, in the same way that the comprehensive system of controlled transportation, distribution, storage, and sale (or furnishing) works to reduce the risk of diversion out of the system, it also works to prevent counterfeit, adulterated, or contaminated products from coming into the system. *Id.* ¶¶ 71-78.

All six bans challenged here fall within the core of the State's power to regulate the transportation, distribution, sale, and consumption of alcoholic beverages under the 21st Amendment. As in *North Dakota*, by reducing price differentials across geographic areas, a "risk of diversion" and of "disruption of the liquor distribution system," a risk that is "both substantial and real" is avoided or at least reduced. 495 U.S. at 432-33 & n.5, 110 S. Ct. at 1993 & n.5. As in *North Dakota*, these requirements "unquestionably serve valid state interests." 495 U.S. at 433, 110 S. Ct. at 1993-94 (footnote omitted).

By denying market incentives – the price differential across geographic areas – that would give rise to a bootleg market, Louisiana regulators avoid the creation of a bootleg market and distribution system. *See, e.g., Lanierland Distributors, Inc. v. Strickland*, 544 F. Supp. 747, 750 (N.D. Ga. 1982) (price differential, because of high taxes, creates "a substantial incentive for bootlegging").

Many of the challenged requirements are regulatory devices, such as a prohibition of inducements, designed to promote the separation, independence, and stability of the tiers. *See Black v. Magnolia Liquor Co.*, 355 U.S. 24, 25, 78 S. Ct. 106, 108-09 (1957) (upholding a similar inducement prohibition in Federal law as a device to avoid having "the retailer . . . coerced into buying distilled spirits he would otherwise not have purchased . . . and [having] other sellers of the products . . . to that extent excluded from the market" and even though the prohibition, as applied, was prophylactic in the sense that the particular prohibited transaction in that case in fact "falls short of creating an exclusive outlet and a permanently 'tied house'" (citation omitted)); *see also Actmedia, Inc. v. Stroh*, 830 F.2d 957, 960 (9th Cir. 1986) ("underlying philosophy in adopting the tied-house statutes was to establish a 'triple-tiered

10

Date:10/31/2007

distribution and licensing scheme' that would keep the manufacturers, wholesalers, and retailers of alcoholic beverages separate from one another and would prevent vertical or horizontal integration" (citation omitted)). These regulatory devices, adopted in the service of avoiding undue concentration within the alcoholic beverage industry, may be questioned, as the present case shows, as restraints of trade under the Sherman Act. It may be said, however, that regulators have favored the antitrust policy of the Clayton Act, *e.g.*, 15 U.S.C. § 18, over the antitrust policy of the Sherman Act – a policy choice well within the core of the State's 21st Amendment authority. *See Dickerson v. Bailey*, 336 F.3d 388, 404 (5th Cir. 2003) ("Some courts have also recognized **the prevention of monopolies** or organized crime from (re)gaining control of the alcohol industry and the collection of taxes **as other policies effectuated by the Twenty-First Amendment**" (footnote omitted, emphasis supplied).[13]

Finally, this "comprehensive system" and these requirements as "necessary components of the regulatory regime," by "promoting temperance, ensuring orderly market conditions, and raising revenue," *North Dakota*, 495 U.S. at 432, 110 S. Ct. at 1993, are likewise within the core concerns of the State's 21st Amendment authority.

This Court finds that Louisiana's 21st Amendment interests are amply substantiated in this case as within the core concerns of the State's 21st Amendment authority and that, under the test being applied here, the challenged State requirements are therefore supported by a strong presumption of validity, which remains unrebutted in this case.

## IV.

Section 1 of the Sherman Act provides, in relevant part, that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. The United States Supreme Court "has always limited the reach of Section 1 to unreasonable restraints of trade effected by a contract, combination . . . , or conspiracy between *separate entities*." *Fisher v. City of Berkeley*, 475 U.S. 260, 266, 106 S. Ct. 1045, 1049 (1986) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S. Ct. 2731, 2740 (1984)) (emphasis in *Fisher* original; internal quotation marks omitted). In so holding, the Supreme Court has further reasoned that a restraint "imposed unilaterally by government does not become concerted-action within the meaning of the statute simply because it has a coercive effect upon parties who must obey the law. The ordinary relationship between the government and those who must obey its regulatory commands whether they wish to or not is not enough to establish a conspiracy." *Id.* 475 U.S. at 267, 106 S. Ct. at 1049.

All of the so-called bans Plaintiffs challenge under the Sherman Act – assuming they qualify as restraints of trade – are restraints imposed unilaterally by government. As such, they do not qualify as concerted action. In the absence of this essential element, Plaintiffs' challenges under the Sherman Act are subject to dismissal.

Apparently anticipating this fatal flaw, Plaintiffs alleged that the bans, though imposed by government, lead to so-called hybrid action. *See* Compl. ¶ 25. A Supreme Court majority first explicitly found a hybrid restraint in *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 107 S. Ct. 720 (1987). The *Duffy* Court wrote that, "Where private actors are . . . granted a degree of private regulatory power . . . the regulatory scheme may be attacked under § 1 as a hybrid restraint" and therewith rejected the argument that no contract, combination, or conspiracy had been shown as required by Section 1 of the Sherman Act. *Id.* 479 U.S. at 345 n.8, 107 S. Ct. at 726 n.8 (internal quotation marks and citations omitted; alteration in *Duffy* original). Elsewhere in its decision, the *Duffy* Court further addressed the issue of concerted action in these terms:

> Resale price maintenance has been a per se violation of § 1 of the Sherman Act "since the early years of national antitrust enforcement." *See Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 404-409, 31 S. Ct. 376, 383-85, 55 L. Ed. 502 (1911). Our recent decisions recognize the possibility that a

---

[13] Congress has made a similar policy choice in its own regulation of the alcoholic beverage industry with the enactment of the Federal Alcohol Administration Act. *See* S. Rep. No. 1215, 74th Cong., 1st Sess. 6-7 (1935) (justifying regulation of trade practices, including the inducement prohibition, to prevent "monopoly," among other evils); *see also Black*, 355 U.S. at 25, 78 S. Ct. at 108 ("One aim of Congress by the present legislation was to prohibit practices that were 'analogous to those prohibited by the antitrust laws'" (citation omitted)).

11

Date:10/31/2007

vertical restraint imposed by a single manufacturer or wholesaler may stimulate interbrand competition even as it reduces intrabrand competition. Accordingly, we have held that concerted nonprice restrictions imposed by a single manufacturer are to be judged under the rule of reason. We also have held that a single manufacturer may announce resale prices in advance and refuse to deal with those who fail to comply. Neither of these qualifications to the per se rule applies in this case. Section 101-bb directly restricts retail prices, and retailers are subject to penalties for failure to adhere to the resale price schedules. The New York statute, moreover, applies to all wholesalers and retailers of liquor. We have noted that industrywide resale price maintenance also may facilitate cartelization. Mandatory industrywide resale price fixing is virtually certain to reduce interbrand competition as well as intrabrand competition, because it prevents manufacturers and wholesalers from allowing or requiring retail price competition. The New York statute specifically forbids retailers from reducing the minimum prices set by wholesalers.

*Duffy*, 479 U.S. at 341-42, 107 S. Ct. at 724 (emphasis supplied, citations other than to *Dr. Miles* omitted).

To the extent the *Duffy* Court presumed concerted action as part of the per se treatment and thereby more readily found hybrid action, its hybrid action holding may be ready to be revisited now that the *Dr. Miles* case has been overruled. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, – U.S. –, 127 S. Ct. 2705, 2710, 2007 WL 1835892, 75 U.S.L.W. 4643 (2007). Even before the *Leegin* overruling of *Dr. Miles*, the *Duffy* decision had been severely criticized.[14]

Defendants argue that, if hybrid action is not merely presumed as in *Duffy* relying upon the overruled *Dr. Miles*, Plaintiffs should be required to show that the governmentally imposed requirements actually lead in fact to concerted action between two or more private parties. At a minimum, under established case law, Plaintiffs should be required to demonstrate that each of the challenged bans does in fact, in the words of *Duffy*, "grant[] a degree of private regulatory power" to "private actors." Plaintiffs make neither showing.

## V.

Commencing in 1943 with *Parker v. Brown*, 317 U.S. 341, 63 S. Ct. 307 (1943), when interpreting the Sherman Act, it has been presumed that Congress did not intend to regulate the States. Even though the State program at issue was anticompetitive, the Supreme Court found no violation of Federal antitrust law, reasoning that "nothing in the language of the Sherman Act or in its history . . . suggests that its purpose was to restrain a state or its officers from activities directed by its legislature." *Parker*, 317 U.S. at 350-51, 63 S. Ct. at 313. This presumption has applied in all cases of potential conflict with State measures, not just in the case of State measures involving alcoholic beverages. The presumption has been steadily expanded to include different kinds of State measures – for instance, measures adopted by State legislatures or by State high courts.

In *Hoover v. Ronwin*, 466 U.S. 558, 104 S. Ct. 1989 (1984), the Supreme Court held that

When the conduct is that of the sovereign itself, on the other hand, the danger of unauthorized restraint of trade does not arise. Where the conduct at issue is in fact that of the state legislature or supreme court, we need not address the issues of "clear articulation" and "active supervision."

---

[14] Judge Luttig, of the Fourth Circuit, contended that the Supreme Court in *Duffy* "misunderstood its own prior precedents" in "holding that the regulations . . . constituted a so-called hybrid restraint." *TFWS, Inc. v. Schaefer*, 242 F.3d 198, 213 (4th Cir. 2001) (Luttig, J., concurring). Judge Luttig argued that the statute and regulations at issue in *Duffy* should instead have been considered unilateral state action and upheld as exempt from the Sherman Act. *Id.* Luttig pointed out that "there can be no liability under § 1 [of the Sherman Act] without an agreement." *Id.* (alteration original). He described hybrid action cases as cases in which "private parties independently reached pricing agreements, which the state then authorized and enforced." *Id.* at 214. Where there is no showing of "voluntary agreement, independently reached, between private parties that is either authorized or enforced by the state," an essential element is absent, and accordingly, there can be no Section 1 violation. *Id.*

*Hoover*, 466 U.S. at 569, 104 S. Ct. at 1995.[15] It was with reliance upon *Hoover* that the Louisiana Court of Appeal applied the *Parker* doctrine to reject an earlier challenge to the statutory ban on credit sales. *Schwegmann Giant Super Markets v. Edwards*, 552 So.2d 1241, 1244-45 (La. App. 1st Cir. 1989).

Defendants make a case for extending the *Parker* doctrine, in cases involving the regulation of alcoholic beverages, to apply to State measures of whatever rank, including State regulations and administrative practices. The called-for extension is particularly appropriate here. *Parker* and progeny are about Congress's presumed intention for application of the Sherman Act to the States in all kinds of contexts. This case, by contrast, concerns Congress's presumed intention for application of the Sherman Act to the States in the specific context of regulating alcoholic beverages. In the specific context of regulating alcoholic beverages, Congress would be aware of the enhanced power of the States brought about by the ratification of the 21st Amendment. Further, the alcoholic beverage industry is, notoriously, a so-called highly regulated industry. In such a context especially, there is a practical need to be nimble and to allow regulators below the rank of the State legislature or the State high court to take authoritative action and, therefore, a corresponding need to show respect for State regulatory measures at every rank – measures adopted by State legislatures or by State high courts as with *Parker* generally, but also State regulations and State administrative practices. A contrary position would assume that Congress insists that a State, in exercise of its 21st Amendment power, regulate the alcoholic beverage industry only through its legislature and its supreme court.

Applying the established *Parker* state action doctrine (as in the *Schwegmann* case), together with this modest extension limited to a case involving State regulation of alcoholic beverages, all of Plaintiffs' Sherman Act claims are subject to dismissal.

## VI.

Louisiana law provides, with exceptions not relevant here, that alcoholic beverages, including those imported into the State, "shall come to rest" with a State-licensed wholesaler before further distribution:

### § 359. Distribution of alcoholic beverages through wholesalers only

A. Except as provided in Subsection B[16] of this Section and R.S. 26:271.1[17] and 326,[18] no alcoholic beverages as defined in R.S. 26:241(1) produced or manufactured inside or outside of this state shall be sold or offered for sale in Louisiana, or shipped or transported into or within the state, except to the holder of a wholesaler's permit. Delivery of alcoholic beverages produced or manufactured inside or outside of this state shall be made at the place of business of the wholesaler shown on the wholesaler's permit, and must be received and warehoused by the wholesaler at that place of business, where such alcoholic beverages shall come to rest before delivery is made to any retailer.

Louisiana Revised Statutes § 26:359A.

All six of the so-called bans challenged under the Sherman Act concern transactions that take place after alcoholic beverages have come to rest with a State-licensed wholesaler. Moreover, after coming to rest with such a wholesaler, when distribution commences thereafter, it is exclusively distribution within the boundaries of the State of Louisiana and exclusively

---

[15] In a footnote, the *Hoover* Court wrote, "This case does not present the issue whether the Governor of a State stands in the same position as the state legislature and supreme court for purposes of the state-action doctrine." *Hoover*, 466 U.S. at 568 n.17, 104 S. Ct. at 1995 n.17.

[16] This provision is the subject of Plaintiffs' final two challenges and is separately discussed below.

[17] This statute creates an exception for microbreweries. Louisiana Revised Statutes § 26:271.1.

[18] This statute was repealed effective June 30, 2006.

13

Date:10/31/2007

distribution terminating with end-use consumers located within the State of Louisiana.[19] Defendants submit that, as applied to Louisiana and to this case, coming to rest with a State-licensed wholesaler should mark the boundary between interstate commerce and intrastate commerce.

The understanding of interstate vs. intrastate commerce argued for here is especially supported by the text and the history of the United States Constitution. Competing claims under the Interstate Commerce Clause have always involved an examination of territory and territorial effect. The later-added 21st Amendment, in turn, expressly tied the new power given to the States to territory:

> **Section 2.** The transportation or importation *into* **any State, Territory, or possession** of the United States **for delivery or use** *therein* of intoxicating liquors, **in violation of the laws** *thereof,* is hereby prohibited.

U.S. CONST. amend. XXI, § 2 (emphasis supplied).[20]

The Sherman Act applies only to restraints of trade that take place in or that substantially affect interstate commerce. Under the argued-for understanding of interstate commerce, post-coming-to-rest exclusively in-state distribution from in-state wholesalers through to end-use consumers located in-state does not affect interstate commerce. Certainly, no showing has been made that these bans, as applied to these Plaintiff retailers, take place in or substantially affect interstate commerce under any understanding of that requirement. Accordingly, Plaintiffs' challenges relying upon the Sherman Act should be dismissed for these reasons as well.

## VII.

Plaintiffs also bring challenges to two additional bans[21] directly under the Interstate Commerce Clause. These claims will be treated together in this order, and both must be dismissed.

## A.

---

[19] The *Frankfort Distilleries* case, as it concerned the issue of interstate commerce, is to be distinguished. In that case, there was a conspiracy to fix prices at the retail level, but the conspiracy chose as is means putting *upstream pressure* on wholesalers and ultimately the *out-of-state* suppliers of alcoholic beverages. 324 U.S. at 298, 65 S. Ct. at 664 ("The combination concerned itself with the type of contract used in making interstate sales; its coercive power was used to compel the producers of alcoholic beverages outside of Colorado to enter into price maintenance contracts. Nor did the boycott used merely affect local retail business. Local purchasing power was the weapon used to force producers making interstate sales to fix prices against their will. It may be true, as has been argued, that under Colorado law, retailers are prohibited from buying from out-of-state producers, but this fact has no relevancy. The power of retailers to coerce out-of-state producers can be just as effectively exercised through pressure brought to bear upon wholesalers as though the retailers brought such pressure to bear directly upon the producers. And combinations to restrain, by a boycott of those engaged in interstate commerce, through such indirect coercion is prohibited by the Sherman Act"); *see also, e.g., Frankfort Distilleries v. United States,* 144 F.2d 824, 827 ("that the defendants Wholesale Association and Package Association, wholesalers, and retailers agree upon and undertake to persuade, induce, and compel producers, including the defendant producers, and wholesalers, to enter into fair trade contracts affecting every type and brand of alcoholic beverage shipped into Colorado") (reversed by 324 U.S. 293).

Here, by contrast, the conspiracy, to the extent Plaintiffs even address this element, is at most a conspiracy at the in-state wholesale level designed to put *downstream pressure* on *in-state* retailers, all of whose sales terminate, as noted, with *end-use in-state* customers.

[20] Additional support for this understanding is found in the recent *Granholm* case as well as the ratification history of the 21st Amendment. In *Granholm,* when weighing the Commerce Clause and the 21st Amendment, the Court concentrated upon protecting out-of-state product from discriminatory treatment. It was the out-of-state origin of the product, and the discrimination against that product, that triggered the protection of the Commerce Clause. *E.g., Granholm,* 544 U.S. at 489, 125 S. Ct. at 1905 ("State policies are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent"). The ratification history of the 21st Amendment by contrast is concerned with investing each State with plenary power to regulate the distribution and sale thereafter of all alcoholic beverages within the State, regardless of origin and with no discussion of authorizing discrimination against out-of-state product. *See* Painter Aff. ¶¶ 2-22.

[21] The ban on direct shipping to consumers by retailers domiciled inside Louisiana and the ban on direct shipping to consumers in prohibition territory by retailers domiciled inside Louisiana.

14

182

Date:10/31/2007

In *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 106 S. Ct. 2080 (1986), the United States Supreme Court summarized its Commerce Clause jurisprudence as follows:

> This Court has adopted what amounts to a two-tiered approach to analyzing state economic regulation under the Commerce Clause. When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. *See, e.g., Philadelphia v. New Jersey*, 437 U.S. 617, 98 S. Ct. 2531, 57 L. Ed. 2d 475 (1978); *Shafer v. Farmers Grain Co.*, 268 U.S. 189, 45 S. Ct. 481, 69 L. Ed. 909 (1925); *Edgar v. MITE Corp.*, 457 U.S. 624, 640-643, 102 S. Ct. 2629, 2639-2641, 73 L. Ed.2d 269 (1982) (plurality opinion). When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 847, 25 L. Ed.2d 174 (1970). We have also recognized that there is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity. *See Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 440-441, 98 S. Ct. 787, 793-94, 54 L. Ed.2d 664 (1978).

*Brown-Forman Distillers Corp.*, 476 U.S. at 578-79, 106 S. Ct. at 2084.

In their final two challenges, Plaintiffs purport to bring a Commerce Clause claim based upon discrimination because certain Louisiana provisions are alleged to discriminate in favor of retailers domiciled outside Louisiana. *See* Compl. ¶¶ 23 & 24. Even assuming this is discrimination, it is discrimination outside the protection of the Commerce Clause jurisprudence.

The Commerce Clause jurisprudence offers protection for the case "When a state statute . . . **discriminates** *against* **interstate commerce, or when its effect is** *to favor* **in-state economic interests** *over* **out-of-state interests.**" *Brown-Forman Distillers Corp.*, 476 U.S. at 579, 106 S. Ct. at 2084 (emphasis supplied).[22] The Commerce Clause cases especially condemn economic protectionism. *E.g., Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S. Ct. 2531, 2535 (1978) ("where simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected"); *cf. Bainbridge*, 311 F.3d at 1114 n.15 ("Since a state can *discriminate* without engaging in *protectionism*, discrimination alone cannot be the touchstone" (emphasis original)).

No discrimination against interstate commerce, and certainly no discrimination in support of economic protectionism, has been alleged here. If the alleged discrimination here – discrimination alleged to be in favor of out-of-state economic interests – is to be corrected, it will not be at the behest of the Federal Commerce Clause.

B.

Again, in their final two challenges, Plaintiffs purport to bring a Commerce Clause claim challenging the inability of an *in-state* retailer to ship directly to an *in-state* end-use consumer generally and in particular to an *in-state* end-use consumer located in Louisiana prohibition territory.

Both prohibitions are squarely within Louisiana's 21st Amendment authority. The Commerce Clause, in turn, should be understood not to govern such purely in-state matters, especially when they are squarely within Louisiana's 21st Amendment authority. Even without the 21st Amendment overlay, these kinds of transactions – and the prohibitions pertaining to them – do not affect interstate commerce and should be regarded as outside the scope of the

---

[22] *Accord Brooks*, 462 F.3d 354 ("the dormant Commerce Clause only prevents a State from enacting regulation that favors in-state producers and thus discriminates *against* interstate commerce" (emphasis original)).

15

Date:10/31/2007

Interstate Commerce Clause. *See generally United States v. Lopez*, 514 U.S. 549, 115 S. Ct. 1624 (1995).

## CONCLUSION

With respect to Plaintiffs' Sherman Act challenges, to the extent there is a conflict between the challenged State measures in regulation of alcoholic beverages, deriving their authority vis-à-vis the Federal Government from the 21st Amendment, and the Sherman Act, deriving its authority from the Commerce Clause, the latter must yield. Even if the Sherman Act, enacted in 1890, was once understood to override such State measures with respect to alcoholic beverages, the Commerce Clause basis for the Sherman Act has since been narrowed by the 21st Amendment, and the Sherman Act should no longer be understood or applied in this manner.

Additionally, far from finding any conflict in State and Federal policies at issue here, they should be understood as congruent with one another and as running parallel.

Also, the Court finds that Defendants have met any procedural burden to raise the 21st Amendment interests and, further, that these interests are amply substantiated in this case as within the core concerns of the State's 21st Amendment authority and that the challenged State measures are therefore supported by a strong presumption of validity, which remains unrebutted in this case. In particular, the Court finds that, if Plaintiffs' challenges were upheld, the result would be a functional collapsing of the wholesale and retail tiers, directly violating Louisiana's determination to establish and maintain a three-tier system for the regulation of alcoholic beverages within the State.

Further, all of the bans challenged under the Sherman Act – assuming they qualify as restraints of trade – are restraints imposed unilaterally by government. As such, they, and actions taken pursuant to them, do not qualify as concerted action. In the absence of this essential element, Plaintiffs' challenges under the Sherman Act are subject to dismissal for this reason as well. To the extent the hybrid action doctrine should apply here, Plaintiffs have shown neither that the governmentally imposed requirements actually lead in fact to concerted action between two or more private parties nor that each of the challenged bans does in fact grant a degree of private regulatory power to private actors.

Further, applying the established state action doctrine, together with a modest extension limited to a case involving State governance of alcoholic beverages at the level of State regulations and State administrative interpretation and practice, all of Plaintiffs' Sherman Act claims are subject to dismissal for this reason as well.

Finally with respect to the bans challenged under the Sherman Act, post-coming-to-rest exclusively in-state distribution from in-state wholesalers through to end-use consumers located in-state does not affect interstate commerce, and certainly, no showing has been made that these bans, as applied to these Plaintiff retailers, take place in or substantially affect interstate commerce under any understanding of that requirement.

With respect to the bans challenged directly under the Commerce Clause, these claims do not involve discrimination against interstate commerce and certainly do not involve discrimination in support of economic protectionism. As such, these claims fall outside the scope of protection afforded by the Commerce Clause.

Additionally, with respect to both Commerce Clause claims, the inability of an *in-state* retailer to ship directly to an *in-state* end-use consumer generally and, in particular, to an *in-state* end-use consumer located in Louisiana prohibition territory does not affect interstate commerce.

For all these reasons, all of Plaintiffs' claims should be and ARE HEREBY DISMISSED. Accordingly, JUDGMENT SHALL BE AND IS HEREBY ENTERED in favor of Defendants and against Plaintiffs on all claims asserted by Plaintiffs.

184

Date:10/31/2007

THUS DONE AND SIGNED on this, the 26th day of October , 2007, at Ville Platte, Louisiana.

The Honorable Larry Vidrine, Judge

13799

10-30-07
This is to certify that ... ...
of the above and foregoing

_Judgement etc_

Has been mailed to:
Stephanie B. Lalonde
Charles E. Smart
David Young
Anthony C. Dupre , Gary Ortego
Deputy Clerk of Court

185

Date:10/31/2007